ACCEPTED
01-15-00836-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/20/2015 10:34:55 AM
CHRISTOPHER PRINE
CLERK

**Appellate Docket Number:**  01-15-00836-CV

**Appellate Case Style:**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/20/2015 10:34:55 AM
CHRISTOPHER A. PRINE
Clerk

## DOCKETING STATEMENT (CIVIL)
_First_ **Court of Appeals**
**[to be filed in the court of appeals upon perfection of appeal
under TRAP 32]**

| I.    Parties (TRAP 32.1(a), (e)): | |
|---|---|
| Appellant(s):<br><br>Estate of Joseph Hernandez, deceased<br>Mary Hernandez, Individually and As Personal Representative of the Estate of Joseph Hernandez, Deceased and Sons Carlos Cruz Hernandez and Jose Cruz Hernandez<br>(*See* note at bottom of page) | Appellee(s):<br><br>The Kroger Co., Kroger Texas, L.P., Kroger Limited Partnership I, Kroger Limited Partnership II, Kroger 509 Operator, Inc., Kroger 017 Operator, Inc. Kroger Management-NMTC Dallas I, LLC, Kroger Management-NMTC Houston I, LLC Kroger Dedicated Logistics Co., The Kroger Foundation, Kroger Associates, Inc.<br>(*See* note at bottom of page) |
| Attorney (lead appellate counsel):<br>Newton B. Schwartz, Sr.(Lead)<br>Benton Musslewhite, Sr. | Attorney (lead appellate counsel, if known; if not, then trial counsel):<br>Brock Akers (Local)<br>James Reuss (primary) |
| Address (lead counsel):<br>1911 Southwest Fwy<br>Houston, Texas 77098 | Address (lead appellate counsel, if known; if not, then trial counsel):<br>3401 Allen Pkwy, Suite 101<br>Houston, Texas 77019<br>280 North High St., Suite 1300<br>Columbus, OH 43215 |
| Telephone:   (713) 630-0708<br>(include area code) | Telephone:   (713) 877-2500<br>(include area code)   (614) 365-4100 |
| Telecopy:   (713) 630-0789<br>(include area code) | Telecopy:   (713) 583-8662<br>(include area code)   (614) 365-9145 |
| SBN (lead counsel):  17869000 | SBN (lead counsel):  00953250 |

If not represented by counsel, provide appellant's/appellee's address, telephone number, and telecopy number.
On Attachment 1, or a separate attachment if needed, list the same information stated above for any additional parties to the trial court's judgment.

# FORM 2

HOU05:76682.1

## II. Perfection Of Appeal And Jurisdiction (TRAP 32.1(b), (c), (g), (j)):

| | |
|---|---|
| Date order or judgment signed:<br><br>September 4,2015<br><br>(Attach a signed copy, if possible) | Date notice of appeal filed in trial court:<br><br>September 30, 2015<br><br>(Attach file-stamped copy; if mailed to the trial court clerk, also give the date of mailing) |
| What type of judgment? (e.g., jury trial, bench trial, summary judgment, directed verdict, other (specify))<br>Defendants' Summary Judgment granted<br>September 4, 2015 | Interlocutory appeal of appealable order:<br>Yes ☐   No ☒<br><br>(Please specify statutory or other basis on which interlocutory order is appealable) (*See* TRAP 28) |
| If money judgment, what was the amount?<br><br>Actual damages: | Accelerated appeal (*See* TRAP 28):<br>Yes ☐   No ☒ |
| Punitive (or similar) damages: | (Please specify statutory or other basis on which appeal is accelerated) |
| Attorneys' fees (trial): | |
| Attorneys' fees (appellate):<br><br>$0 | |
| Other (specify): | Appeal that receives precedence, preference, or priority under statute or rule?<br>Yes ☐   No ☒<br><br>(Please specify statutory or other basis for such status) |

HOU05:76682.1

−2−

Appeal from final judgment?  Yes ☐     No ☒     Will you challenge this Court's jurisdiction?  If yes, explain.

Does judgment dispose of all parties and issues:
 Yes ☒    No ☐

Does judgment have a Mother Hubbard clause?
(E.g.:  "All relief not expressly granted is denied"):
 Yes ☒    No ☐

Does judgment have language that one or more parties
"take nothing"?
 Yes ☒    No ☐

Other basis for finality?

---

**III.     Actions Extending Time To Perfect Appeal (TRAP 32.1(d)):**

| Action | Filed Check as appropriate | | Date Filed |
|---|---|---|---|
| Motion for New Trial | No ☐ | Yes ☒ | September 22, 2015 |
| Motion to Modify Judgment | No ☒ | Yes ☐ | |
| Request for Findings of Fact and Conclusions of Law | No ☐ | Yes ☒ | September 21, 2015 |
| Motion to Reinstate | No ☒ | Yes ☐ | |
| Motion under TRCP 306a | No ☒ | Yes ☐ | |
| Other (specify): | No ☒ | Yes ☐ | |

**IV.     Indigency Of Party (TRAP 32.1(k)):**  (Attach file-stamped copy of affidavit)

| Event | Filed Check as appropriate | | Date | N/A |
|---|---|---|---|---|
| Affidavit filed | No ☒ | Yes ☐ | | |
| Contest filed | No ☒ | Yes ☐ | | |
| Date ruling on contest due: | | | | |
| Ruling on contest: Sustained ☐     Overruled ☐ | | | | |

**V.     Bankruptcy (TRAP 8):**

Will the appeal be stayed by bankruptcy?     No          Date bankruptcy filed?     N/A

Name of bankruptcy court:                         Bankruptcy Case No.:

Style of bankruptcy case:

## VI. Trial Court And Record (TRAP 32.1(c), (h), (i)):

| Court:<br>149th | County:<br>Brazoria | Trial Court Docket Number<br>(Cause No.):<br>74064 |
|---|---|---|

| Trial Judge (who tried or disposed of case):<br>Terry Holder<br><br>Telephone Number:(979) 864-1318<br>(include area code)<br><br>Telecopy Number: N/A<br>(include area code)<br>Address: Brazoria County Civil Courthouse<br>    111 East Locust St., Rm. 214A<br>    Angleton, Texas 77515 | Court Clerk (district clerk):<br>Rhonda Barchak<br><br>Telephone Number: (979) 864-1316<br>(include area code)<br><br>Telecopy Number:  N/A<br>(include area code)<br>Address: Rhonda Barchak, District Clerk<br>    Brazoria County Civil Courthouse<br>    111 East Locust St., Suite 500<br>    Angleton, Texas 77515-4678 |
|---|---|

| Clerk's Record<br><br>Yes  ☒ | Sworn copy for<br>accelerated appeal<br><br>Yes  ☐<br><br>(*See* TRAP 28.3) | Will request  ☐<br><br>(Note: No request required<br>under TRAP 34.5(a), (b)) | Was requested on:<br><br>October 6, 2015 |
|---|---|---|---|

| Court Reporter or Court Recorder:<br>Robin Rios, Court Reporter<br><br><br>Telephone Number:  (979) 864-1483<br>(include  area code)<br><br>Telecopy Number:  N/A<br>(include  area code)<br><br>Address: 111 East Locust St.<br>    Room 214A, Angleton, TX 77515 | Court Reporter or Court Recorder:<br><br><br>Telephone Number:<br>(include area code)<br><br>Telecopy Number:  N/A<br>(include area code)<br><br>Address: |
|---|---|

(Attach additional sheet if necessary for additional court reporters/recorders)

| Length of trial (approximate): | State arrangements made for payment of court<br>reporter/recorder:  Paid in full per attached<br>    payment and receipt |
|---|---|

| Reporter's or Recorder's Record<br>(check if electronic recording ☒) | None  ☐ | Will request ☐ | Was requested on: October 13, 2015 |
|---|---|---|---|

**VII. Nature Of The Case (TRAP 32.1(f))** (Subject matter or type of case: E.g., personal injury, breach of contract, workers' compensation, or temporary injunction) (*see* list below):

Wrongful death--CPRC § 71.001; Public policy of Texas Personal Injury and Survival and death action product liability and negligent food safety violations per CPRC §71.021; and four violations of Federal "Food, Drug and Cosmetic Act per 21 U.S.C. 2101-2110 and § 346a; and noticed violations for adulterated or misbranded foods per 21 U.S.C. 352 and 373.

| | |
|---|---|
| Administrative/agency _____ | Malpractice |
| |    Legal _____ |
| |    Medical _____ |
| Banking _____ |    Other _____ |
| Business __x__ | Motor Vehicle _____ |
| Condemnation _____ | Municipal _____ |
| Consumer/DTPA __x__ | Oil & Gas _____ |
| Construction _____ | Personal Injury __x__ |
| Contract __x__ | Premises Liability _____ |
| Employment/Labor _____ | Probate _____ |
| Family _____ | Products Liability __x__ |
|    Custody _____ | Real Property _____ |
|    Property Division _____ | Securities _____ |
|    Termination _____ | Tax _____ |
|    Other _____ | U.C.C./Tex. Bus. & Com. Code __x__ |
| Fraud __x__ | Venue _____ |
| Insurance _____ | Workers' compensation _____ |
| Juvenile _____ | Other (specify): _____ |
| Landlord/Tenant _____ | |

| **VIII. Supersedeas Bond (TRAP 32.1(1)):** | None ☒ | Will file ☐ | Was filed on: |
|---|---|---|---|

**IX. Extraordinary Relief:** Will you request extraordinary relief (e.g., temporary or ancillary relief) from this Court? Yes ☐ No ☒ If yes, briefly state the basis for your request.

**X. Pro Bono Pilot Program:** The Third Court of Appeals, in conjunction with the State Bar of Texas Appellate Section Pro Bono Committee, is conducting a Pro Bono Pilot Program to place a limited number of civil appeals with appellate counsel who will represent the appellant in the appeal before this Court. The Pro Bono Committee will screen and select the civil cases for inclusion in the Program based upon a number of discretionary criteria, including the financial means of the appellant. If a case is selected by the Committee and can be matched with appellate counsel, that counsel will take over the representation of the appellant without charging legal fees. More information regarding this program can be found in the *Third Court of Appeals Pro Bono Pilot Program Pamphlet* available in paper form at the Clerk's Office or on the Internet at http://www.tex-app.org. If your case is selected, and we match your case with one of our volunteer lawyers, you will receive a letter from the Committee within thirty (30) to forty-five (45) days of submitting this Docketing Statement. **NOTE: There is no guarantee that, if you submit this case for possible inclusion in the Pro Bono Pilot Program, the Pro Bono Committee will select your case and that pro bono counsel can be found to represent you. Accordingly, you should not forego seeking other counsel to represent you in this proceeding. By signing your name below, you are authorizing the Pro Bono Committee to transmit publicly available facts and information about your case, including parties and background, through selected Internet sites and a Listserv to its pool of volunteer appellate attorneys.**

1.      Do you want this case to be considered for inclusion in the Pro Bono Pilot Program?

              Yes  ☐                No  ☒

If you answered "Yes" to Question X.1, then please answer the following questions.

2.      Do you authorize the Pro Bono Committee to contact your trial counsel of record in this matter to answer questions the committee may have regarding the appeal? Please note that any such conversations would be maintained as confidential by the Pro Bono Committee and the information used solely for the purposes of considering the case for inclusion in the Pro Bono Pilot Program.

              Yes  ☐                No  ☒

3.      If you have not previously filed an affidavit of indigency and attached a file-stamped copy of that affidavit, does your income exceed 175% of the U.S. Department of Health and Human Services Federal Poverty Guidelines? These guidelines can be found in the *Third Court of Appeals Pro Bono Pilot Program Pamphlet* as well as on the Internet at http://aspe.hhs.gov/poverty/06poverty.shtml.

              Yes  ☐                No  ☒

4.      Are you willing to disclose your financial circumstances to the Pro Bono Committee? If so, please attach an Affidavit of Indigency completed and executed by the appellant. Forms may be found in the Clerk's Office or on the Internet at http://www.tex-app.org. Your participation in the Pro Bono Pilot Program may be conditioned upon your execution of an affidavit under oath as to your financial circumstances.

              Yes  ☐                No  ☒

5.      Give a brief description of the issues to be raised on appeal, the relief sought, and the applicable standard of review, if known (without prejudice to the right to raise additional issues or request additional relief; use a separate attachment, if necessary). See attached Exhibit FF.

**XI.      Related Matters:**  List any pending or past related **appeals or original proceedings** (e.g., mandamus, injunction, habeas corpus) before this or any other Texas appellate court by court, docket number, and style.      N/A

**XII.**      Any other information requested by the court (see attachments, if any).      N/A

**XIII.      Signature:**

/s/ Newton B. Schwartz, Sr.
_____
Signature of counsel
(or pro se party)

Printed Name:  Newton B. Schwartz, Sr.
_____

Date:  October 20, 2015
_____

State Bar No.: 17869000
_____

**XIV.** **Certificate of Service:** The undersigned counsel certifies that this docketing statement has been served on the following lead counsel for all parties to the trial court's order or judgment as follows on

___October 20___, by~~x~~ 2015

Via U.S. Regular mail, electronic transmittal and facsimile transmission on:

James Reuss                                     VIA FAX: (614) 365-9145
Carpenter, Lipps & Leland, LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
Email:reuss@carpenterlipps.com
Telephone: (614) 365-4100
Brock C. Akers                                  VIA FAX: (713) 583-8662
The Akers Firm
3401 Allen Parkway, Suite 101
Houston Texas 77019
Telephone: (713) 877-2500
Email: bca@akersfirm.com
ATTORNEY FOR DEFENDANTS/APPELLEES

/s/ Newton B. Schwartz, Sr.
Signature

(TRAP 9.5(e) requirements stated below; use additional sheets, if necessary)

**Note:** **Certificate of Service Requirements (TRAP 9.5(e)):** A certificate of service must be signed by the person who made the service and must state:

(1)     the date and manner of service;
(2)     the name and address of each person served; and
(3)     if the person served is a party's attorney, the name of the party represented by that attorney.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SW 103 122 B 09/03/2011 135200 26 | $0.00 | $0.00 | $0.00 | $0.00 | Loyalty Card Enter | COMPLETE | 0 | INFO 40754777571 |
| WATERMELON SEEDLESS 45CT | $4.98 | $4.98 | $0.00 | $0.00 | Regular | | 1 | SKU |
| MELONS CANTALOUPES | $0.00 | $0.00 | $-0.99 | $0.00 | Loyalty Card | 0 | TDS | |
| ON TARGET BRGAIN BKS 3.99 | $2.00 | $2.00 | $0.00 | $0.00 | Regular | 1 | SKU | Keyed |
| CARS2 SUPER SPIES | $3.99 | $3.99 | $0.00 | $0.00 | Regular | 1 | SKU | Keyed |
| YPLT LT THK CRM KY LME YG | $3.99 | $3.99 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM CHRY COB | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM STRWBR YG | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM KY LME YG | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM CHRY COB | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM CHRY COB | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM STRWBR YG | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| TRIDENT VITALITY REJUVE | $1.29 | $1.29 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| YPLT LT THK CRM KY LME YG | $0.66 | $0.66 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| BF BRISKET WHOLE BL | $26.59 | $28.59 | $0.00 | $0.00 | Regular | 1 | SKU | Swiped |
| | $0.00 | $0.00 | $-9.19 | $0.00 | Loyalty Card | 0 | TDS | |
| | $0.00 | $0.00 | $0.00 | $50.00 | Cash | 0 | TND | |
| | $0.00 | $0.00 | $0.00 | $-9.30 | Cash | 0 | TND | |
| | $0.00 | $0.00 | $0.00 | $0.00 | Loyalty Card Final | 0 | INFO | |
| | $0.00 | $0.00 | $0.00 | $0.00 | Used Targeted Coupons | 0 | INFO | |
| | $0.00 | $0.76 | $0.00 | $0.00 | Tax | 0 | TAX | |
| al for Trans # | | $50.96 | $-10.18 | $40.70 | | | 14 | |
| port Totals: | | $50.96 | $-10.18 | $40.70 | | | 14 | |

COPY

 **FAX**

**Date** _3-14-14_

**To:** _Att. Newton Schwartz_
_attention Pam_

**Fax #** _713-630-0789_

**From:** _Joe Hernandez_

**# Pages** (without cover sheet) _____

**Notes:**

A white lady at the Kroger produce
(blondish about 5'7") said they were
from Colorado.
Sending you the receipt on our
purchase.

*Bm copy*

NO. 74064

JOSEPH HERNANDEZ AND : IN THE DISTRICT COURT OF
MARY HERNANDEZ :

vs. : BRAZORIA COUNTY, TEXAS

THE KROGER CO., KROGER TEXAS :
L.P, KROGER LIMITED :
PARTNERSHIP I, KROGER LIMITED:
PARTNERSHIP II, KROGER 509 :
OPERATOR, INC., KROGER 017 :
OPERATOR, INC., KROGER :
MANAGEMENT - NMTC DALLAS I, :
LLC, KROGER MANAGEMENT - NMTC:
HOUSTON I, LLC, KROGER :
DEDICATED LOGISTICS CO., THE :
KROGER CO. FOUNDATION, :
KROGER ASSOCIATES, INC., :
KROGER/377 L.P. : 149TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
MARY ANN HERNANDEZ
MAY 27, 2015
VOLUME 1 OF 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of MARY ANN HERNANDEZ, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the date of May 27, 2015, from 9:45 a.m. to 12:07 p.m., before Cherlyn K. Mann, CSR in and for the State of Texas, reported by stenographic method, at the Law Office of Newton B. Schwartz, Sr., 1911 Southwest Freeway, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

---

APPEARANCES

FOR THE PLAINTIFFS:

Mr. Newton B. Schwartz, Sr.
LAW OFFICE OF NEWTON B. SCHWARTZ, SR.
1911 Southwest Freeway
Houston, Texas 77098
Phone: (713) 630-0708
Fax: (713) 630-0789
AND
Mr. Benton Musslewhite
LAW OFFICE OF BENTON MUSSLEWHITE
1705 West Gray, Suite A
Houston, Texas 77019
Phone: (832) 656-1637
Fax: (713) 680-1068, Room 101

FOR THE DEFENDANTS:
Mr. James K. Reuss
CARPENTER LIPPS & LELAND LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
Phone: (614) 365-4100
Fax: (614) 365-9145
E-mail: reuss@carpenterlipps.com
AND
Mr. George Edwards, III
THE AKERS FIRM
3401 Allen Parkway
Suite 101
Houston, Texas 77019
Phone: (713) 877-2501
Fax: (713) 583-8662

VIDEOGRAPHER:

Ms. Pamela Holman

---

INDEX

Appearances............................ 3
Stipulations............................ 4
MARY ANN HERNANDEZ
  Examination by Mr. Reuss........... 4
Signature and Changes............. 100
Reporter's Certificate............. 102

EXHIBITS

NO.  DESCRIPTION                     PAGE
1    Transaction detail          23
4    Certificate of Death        97
10   Time Line of Illness        97
14   Revocable Living Trust Agreement    96
15   Last Will and Testament of Joe J.    96
     Hernandez
22   Medical Examiner's report           //
24   Pathology report, 11/02/11          85
27   Voluntary Affidavit of Relinquishment   96
     of Paternal Rights
33   Cover letter with letter from Baylor    84
     Clinic Infectious Disease to Mr. Hernandez
42   Columbia-Brazoria ISD payment record    91
43   2014 1040EZ form for Carlos Hernandez   91
44   2013 1040 form for Joe and Mary         91
     Hernandez
45   Copy of Kroger loyalty card         22
54   Notice of Deposition                //

---

THE REPORTER: Pursuant to the Rules?

MR. REUSS: Yes.

THE VIDEOGRAPHER: The time is now 9:47. We are going on the record.

THE REPORTER: And would you like the witness to read and sign?

MR. SCHWARTZ: We're taking this under Rule 203 of the Texas Rules of Civil Procedure, which is the same as Federal Rule 30(E) to read and sign, only it's 20 days in state court. It's 30 in Federal court.

And you're to send her original to my office, not to Mr. Musslewhite, to my office for signing. And we can go ahead and proceed.

(Witness sworn.)

MR. SCHWARTZ: Incidentally, we'll waive any pro hac vice for counsel. You've said you applied here in the district --

MR. REUSS: Yes.

MR. SCHWARTZ: -- Federal court or state court?

MR. REUSS: Yes. And my understanding is the judge is going to sign the order today.

MR. SCHWARTZ: We waive. We assume that you're qualified. You're admitted in Ohio?

REPORTING COPY - NOT FOR SIGNATURE

**5**

MR. REUSS: I certainly am.

MR. SCHWARTZ: Huh?

MR. REUSS: I certainly am.

MR. SCHWARTZ: You know Stanley Chesley?

MR. REUSS: I certainly do.

MR. SCHWARTZ: I've worked some cases with him and some against him.

MR. REUSS: His wife is a Federal judge.

MR. SCHWARTZ: Yes. I was afraid to ask.

MR. REUSS: I have. Okay. Well, thank you.

MARY ANN HERNANDEZ, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. REUSS:

Q. Mrs. Hernandez, would you please state your full name for the record?

A. Mary Ann Hernandez.

MR. SCHWARTZ: You'll have to speak a little louder for me and the court reporter.

A. Mary Ann Hernandez.

Q. Mrs. Hernandez, my name is Jim Reuss. We, I think, introduced each other sort of informally before the deposition. And along with Brock Akers and George Edwards, we represent the Kroger Company in connection

**6**

with the lawsuit that was filed by -- on behalf of both you and your husband arising out of an incident that happened back in September of 2011. You're familiar with that lawsuit. Correct?

A. Yes.

Q. We are taking your deposition today, and let me ask my first question: Have you ever given a deposition before like we're doing here?

A. I don't think so.

Q. Okay. Have you ever been a party to a lawsuit before this one?

A. My husband, not -- not me.

Q. Okay. We'll get into that, but not you. So you've never had to sit through this process that we're going through today?

A. I don't think so. I don't remember.

MR. SCHWARTZ: We've got papers of the adoption. You weren't involved in that?

THE WITNESS: Adoption? There was no adoption.

MR. SCHWARTZ: Or the trust agreement.

THE WITNESS: Oh, we signed papers on trust and stuff but never anything like this.

MR. SCHWARTZ: Okay. Excuse me.

Q. (BY MR. REUSS) And what is your date of

**7**

birth?

A. 2/3/57.

Q. And your place of birth?

A. Houston.

Q. Have you lived in the Houston area or this area of Texas throughout most of your life?

A. My whole life.

Q. Okay. You were married to Joe Hernandez. Correct?

A. Yes.

Q. And it's my understanding that Mr. Hernandez is deceased. Is that so?

A. Yes.

Q. Okay. When did he die?

A. June 4th, 2014.

Q. Okay. And, Mrs. Hernandez, I kind of jumped ahead here a little bit.

A. That's okay.

Q. I want to go over a few things, if I could. The rules of our deposition are pretty simple. I'm going to ask you a series of questions, and I'd ask you to answer those questions to the best of your ability. If at any time, you want to take a break for any reason at all --

A. I'm sorry.

**8**

Q. Oh, that's okay. Just a restroom break or if you want to talk to Mr. Schwartz for any reason, you let me know that, and we'll accommodate you. Okay?

A. Okay.

Q. I don't think we're going to be here real, real long. I try to take shorter and shorter depositions as time goes on, but if for any reason you want to take a break, you just let us know and we'll accommodate you. Okay?

A. All right.

Q. One other --

MR. SCHWARTZ: Incidentally -- of course, you can take up to six hours if you want to, but we had scheduled another matter this afternoon sometime, so if she's up to, we'd prefer going straight through with the usual breaks rather than a lunch break.

MR. REUSS: Oh, sure. That will be fine with me. That will be fine with me.

Q. (BY MR. REUSS) Whatever you want.

A. I'm good. I want to try to get to work, if I can.

Q. Okay. Very good. Another one of the rules is we have to speak individually. So I'll ask you to allow me to complete my question before you answer. And by the same token, I'll let you finish your answer

9

before going to my next question.

A. Okay.

Q. Fair enough? And I know sometimes when we speak in normal conversation we say uh-huh and things like that. Here we have to speak verbally, so that we can get a clear record with the court reporter taking -- taking down everything we say here. Correct?

A. Yes.

Q. You understand that? Okay. You also understand that at the end of the deposition, at some point you will have an opportunity to read your testimony in a booklet form, and you'll also have an opportunity to see the videotape of your testimony and to make corrections or changes if you care to and to sign the deposition. You understand that?

A. Yes.

Q. Okay. And you understand the purpose of the deposition is so we know, if this matter goes to trial, what information you have about the events that we're going to be discussing. You understand that?

A. Yes.

Q. Okay. Okay. You were married to Joe Hernandez. Correct?

A. Yes.

Q. And what was the date of your marriage to

10

Mr. Hernandez?

A. October 18th, 1975.

Q. And where were you and Mr. Hernandez married?

A. Brazoria.

Q. And is Brazoria a city in Brazoria County?

A. Yes.

Q. Okay. Is Brazoria the capital or the county seat?

A. Brazoria -- yes.

Q. Okay. Okay. Was that the first and only marriage for both you and Mr. Hernandez?

A. Yes.

Q. Did you and Mr. Hernandez have -- do you have any children?

A. Yes.

Q. Okay. And what are their names and ages?

A. Jose Cruz Hernandez, 33 years old.

Q. Okay.

A. Carlos Cruz Hernandez, 32 years old.

Q. Okay. Two sons?

A. Yes.

Q. Carlos and Jose. Correct?

A. Yes.

Q. Is Jose married?

A. Yes.

11

Q. And what's his wife's name?

A. Angela.

Q. And is Carlos married?

A. No.

Q. Okay. Has Carlos ever been married?

A. No.

Q. Okay. Does Jose have any children?

A. No.

Q. Okay. And does Carlos have any children?

A. Yes.

Q. Okay. And what is the name of Carlos's child?

A. Jacob.

Q. Jacob Hernandez?

A. Yes.

Q. And how old is Jacob?

A. Seven.

Q. Jacob is your grandson?

A. Yes.

Q. Is that your only grandchild?

A. Yes.

Q. Before we leave Jose and Carlos, let me ask you, does Jose work outside -- is Jose employed?

A. Yes.

Q. What does he do?

A. He's with Schlumberger, computer something. I

12

don't know.

Q. He has a tech job of some sort?

A. Yes.

Q. Okay. And how about Carlos; is he employed?

A. Yes.

Q. What does he do?

A. I can't remember the -- it's the prison system, TDE --

MR. SCHWARTZ: Texas Department of Corrections. They call it TDC --

MR. REUSS: Okay.

MR. SCHWARTZ: -- for the acronym.

Q. (BY MR. REUSS) Okay. And what does he do for TDC?

A. He's a guard.

Q. Okay. At a particular prison?

A. In Rosharon. I believe it's Stringfellow.

Q. Okay. Okay. And so you have two sons and one -- one grandchild. Correct?

A. Yes.

Q. Were you and Mr. Hernandez ever legally separated for any reason during your marriage?

A. Legally, no.

Q. Okay. Did there come a time when you were separated?

READING COPY FOR SIGNATURE

13

A. Yes.

Q. How long ago was that?

A. It was during the month of May last year.

Q. Okay. And what caused that separation?

A. I don't know how to put it. He believed there was a man that was following me around.

Q. Okay. Okay. And this was the month before he passed, Mr. Hernandez passed?

A. Yes.

Q. Okay. And did he move out of the house?

A. No, he didn't.

Q. Okay. When I say -- Mr. Hernandez did not move out of the house?

A. No.

Q. Did you move out of the house?

A. Yes.

Q. Okay. Did he accuse you of -- of having an affair?

A. No.

Q. What was his concern about the man who he thought was following you?

A. He thought the man had interest in me.

Q. Okay. And that became -- that became somewhat tense in your household; and, therefore, you moved out. Is that correct?

14

A. Yes.

Q. And how late -- or how long did you separate from Mr. Hernandez?

A. Less than a month.

Q. Were you living together with him at the time that he died?

A. No.

Q. On the day that he died?

A. No.

Q. Okay. So you -- you moved out less than a month, and then he passed away while you were still living away from him?

A. Yes.

Q. Okay. All right. Other than that incident, had you ever been legally separated at any time in your marriage?

A. No.

Q. Or living apart from Mr. Hernandez?

A. No.

Q. Okay. Mrs. Hernandez, what is your current address?

A. 16909 County Road 809, Brazoria, Texas.

Q. Okay. And how long did you live there, or have you lived there?

A. I'm guessing about 20 -- 22 years. I'm not

15

positive.

Q. Okay. And you lived there with your husband other than this period of separation. Correct?

A. Yes.

Q. And going back 22 years, it appears that your sons went to high school probably while you were living there. Is that correct?

A. Yes.

Q. Okay. And you lived there about 22 years?

A. (Witness nods head affirmatively.)

Q. Do you own the home at that location?

A. Yes.

Q. Okay. And we're going to talk about events that happened in September of 2011. So with that date in mind, has anybody resided at your residence since September of 2011, other than you, husband?

A. And myself?

Q. And yourself.

A. No.

Q. Kids -- your two sons have lived in their own houses, I assume. Correct?

A. Yes.

Q. Mrs. Hernandez, can you give me just a brief description of your -- your educational background? You graduated from high school?

16

A. I did.

Q. What high school was that?

A. Columbia -- Columbia High School.

Q. That's in Brazoria?

A. It's in West Columbia. It's two towns that have come together, and it's -- the district is called Columbia-Brazoria ISD.

Q. Okay. And what year did you graduate?

A. 1976.

Q. Okay. Do you have any college?

A. No.

Q. Are you currently employed?

A. Yes.

Q. And where do you work?

A. Columbia-Brazoria ISD.

MR. SCHWARTZ: It's independent school district.

MR. REUSS: I learned that today on the -- on TV watching all the school districts --

MR. SCHWARTZ: Close?

MR. REUSS: -- close or have delays.

Q. (BY MR. REUSS) Okay. Columbia-Brazoria ISD?

A. ISD.

Q. Okay. And that's the school district. Right?

A. Yes.

PENDING COPY - NOT FOR SIGNATURE

17

Q. And what do you do for them?

A. I'm a paraprofessional or what they used to call an aide.

Q. How long have you been employed by the school district?

A. Twenty-four years.

Q. And have you been a paraprofessional or aide throughout that entire period of time?

A. Yes.

Q. Okay. Can you just briefly tell me what your duties are in that capacity?

A. Well, for 21 years, I worked in the computer lab. I tended to computers and students from pre-K to sixth grade. I am now currently the librarian aide, and I tend to pre-K to sixth grade students in the library.

Q. Okay. Now, we're going to talk about your husband's medical treatment in a little bit, but have you treated with any doctors or health care professionals, including psychologists or psychiatrists, for any physical or mental condition that you suffered from as a result of your husband's illness and death?

A. No.

Q. Okay. I'd like to ask you a few questions

18

about your shopping history, and your husband's shopping history. In September of 2011, where did you do your grocery shopping?

A. In general?

Q. In general.

A. Wal-Mart, Kroger, a little store in Brazoria called Stewart's. There's also a Stewart in Sweeny.

Q. Okay. Two Stewart stores?

A. Yes.

Q. Okay. You don't have a Costco where you live?

A. No.

Q. Okay. And I know that there's a Kroger store in Clute.

A. Clute.

Q. Is Clute also in Brazoria County?

A. Yes.

Q. Okay. Is that the -- did you -- were you accustomed to doing your grocery shopping at any other Kroger store, other than the one in Clute, in September of 2011?

A. No.

Q. I'm not sure how old that store is, but -- do you happen to know how old that store is?

A. No.

Q. How long had you been doing routine grocery

19

shopping at the Clute -- strike that.

How long had you been shopping on a routine basis at the Kroger store in Clute?

A. I couldn't give you a definite answer. We just go from store to store because of sales.

Q. Okay. Had you shopped at the Kroger store at Clute for several years?

A. Yes.

Q. Same thing at Wal-Mart?

A. Yes.

Q. Same thing true at Wal-Mart?

A. Yes.

Q. Okay. And where is the Wal-Mart store located?

A. Lake Jackson.

Q. Is Lake Jackson also in Brazoria County?

A. Yes.

Q. Okay. And you mentioned the locations of the two Stewart stores, but give that to me again.

A. Brazoria and Sweeny.

Q. Also within the county?

A. Yes.

Q. Okay. Did you have a -- strike that.

Do you know a -- what I mean when I refer to a loyalty card or a loyalty account?

20

A. Yes.

Q. Okay. And the Kroger Company has a loyalty program where you can use a loyalty card when you shop. Correct?

A. Yes.

Q. Do you have a loyalty card?

A. Yes.

Q. Did you have a loyalty card in September of 2011?

A. Yes.

Q. About how long had you had that -- have you had the -- a loyalty card at Kroger?

A. Not a specific time because I didn't keep track of it. I would always get a new one if I couldn't find the old one.

Q. You're like me. Okay.

MR. SCHWARTZ: Counsel, because you've been fairly forthright, unlike prior counsel, here's a copy of it. I've marked it as Exhibit 45.

MR. REUSS: Okay. Okay. Thank you very much.

MR. SCHWARTZ: She's got it -- she's got it. You can physically -- if you want to check it.

MR. REUSS: I will do that. I will do that. Let me -- thank you, Mr. Schwartz.

READING COPY FOR SIGNATURE

21

MR. SCHWARTZ: You may also want this one.

MR. REUSS: Okay.

MR. SCHWARTZ: It's Exhibit No. 1. That's the purchase -- the purchase of the actual melon --

MR. REUSS: Okay. I appreciate that.

MR. SCHWARTZ: -- that's in issue, and I'm giving it to the court reporter.

MR. REUSS: Okay. Give me just a second here.

MR. SCHWARTZ: Can you switch with me? Hers has got an exhibit number on it.

MR. REUSS: Oh, sure. Sure.

MR. SCHWARTZ: It's Exhibit 1.

MR. REUSS: What's the exhibit number, Norm?

MR. SCHWARTZ: 1.

MR. REUSS: 1. Okay.

MR. SCHWARTZ: And I have 51 other Exhibits. Even though none are subpoenaed, as they are appropriate, I will be showing them to you because, obviously --

MR. REUSS: Very good.

MR. SCHWARTZ: -- there's a lot of

22

numerous medical providers.

MR. REUSS: Okay. Yes.

Q. (BY MR. REUSS) And, Ms. Hernandez, let me hand you what's been marked as Plaintiffs' Exhibit 45. It appears to be a Xerox copy of the front and back of a Kroger loyalty card. Is that correct?

A. Yes.

Q. And is that the front and back of a Kroger loyalty card that's registered in your name?

A. Yes.

Q. And you mentioned that you had had occasion to get -- to go in the store and get additional loyalty cards from time to time?

A. Right.

Q. So you might run in, see something's on sale, want to get it on a loyalty card. You can't find your loyalty card, so you'd pick up another?

A. Correct.

Q. When you did that, though, you probably didn't fill out all the identifying information in the card when you'd just run in to get it, or do you -- did you?

A. Yes, I did.

Q. Oh, did you? Okay. Okay. Do you know how many loyalty accounts are associated with your household?

23

A. No.

Q. Okay. All right. Fair enough. And now let me --

MR. SCHWARTZ: If you want to see the original -- I apologize. We didn't do it in color. She has the original here, if you want it.

MR. REUSS: That's okay. It's legible.

Q. (BY MR. REUSS) Do you have the original? Let me see it, if we could.

MR. SCHWARTZ: We had to get these documents ready, even though none were subpoenaed.

MR. REUSS: Let's go off the record for just a second.

THE VIDEOGRAPHER: The time is now 10:04. We're going off the record.

(Break.)

THE VIDEOGRAPHER: The time is now 10:06. We are back on the record.

Q. (BY MR. REUSS) Okay. And -- and, Ms. Hernandez, I'm going to also show you what's been marked as Plaintiffs' Exhibit No. 1. And this appears to be a transaction history associated with your loyalty card. Is that your understanding?

A. Yes.

Q. Okay. And I know you didn't prepare that

24

document or have anything to do with it, but that's your general understanding?

A. Yes.

Q. All right. Okay. Exhibit 1 also makes reference to melons cantaloupe. There's an arrow there. A transaction date of 9/3/2011, and then some information relating to price and other matters. Correct?

A. Yes.

Q. Okay. And it's your understanding that the purchase of those cantaloupes on September 3, 2011 was made in association with the use of a Kroger loyalty card?

A. Yes.

Q. Correct?

Okay. Would you make it a pattern to use a loyalty card when you went in to shop on a routine basis?

A. Yes, because of sales.

Q. Okay. And even if you -- you mentioned even if you didn't have your card with you, you'd take -- you've get another card to -- to make a sale or to make a purchase if you could get a sale price?

A. Yes.

Q. Okay. Sometimes I know the format of these

REPRODUCTION COPY NOT FOR SIGNATURE

loyalty cards are such that you can put them on key chains. Did you ever have a key chain loyalty card?

A. Yes.

Q. Okay. And then you'd have the regular card like the type you showed me here. Correct?

A. Right.

Q. I'll give that back to you.

MR. SCHWARTZ: Can you hold that up for the jury to see the color of it? That's Exhibit 50 -- what -- 40 --

MR. REUSS: 45, I think.

MR. SCHWARTZ: 45. Right.

Q. (BY MR. REUSS) Okay. Mrs. Hernandez, did you know the names of any of the employees at the Clute Kroger store in September of 2011?

A. No.

Q. Okay. Didn't know anybody by name?

A. No.

Q. Okay. You also did some grocery shopping at the Wal-Mart store in Lake Jackson in September of 2011?

A. Yes.

Q. Were you a member of their Sam's Club?

A. No.

Q. Okay. So you -- did they have a loyalty card program?

A. No.

Q. Okay. So you never had any type of club membership or program membership that got you discounts at the Wal-Mart store?

A. No.

Q. Did you ever buy watermelon at Wal-Mart? Watermelon. Excuse me. Did you ever buy cantaloupe at Wal-Mart?

A. Probably, I can't tell you I did then.

Q. Okay. Do you know whether you purchased any cantaloupe in August or September of 2011 from the Wal-Mart store in Lake Jackson?

A. No.

Q. Do you know whether -- that is to say, you don't know one way or the other?

A. Right.

Q. Okay. Do you know one way or the other whether you purchased any cantaloupe at either of the Stewart's stores in August or September of 2011?

A. No.

MR. SCHWARTZ: No, you didn't buy them or --

A. No. We didn't buy any there.

Q. (BY MR. REUSS) Okay. You don't know whether you purchased any in August or September of 2011 at Wal-Mart, but you know that you did not at the Stewart stores?

A. Correct.

Q. Okay. Did Mr. Hernandez have a -- any separate loyalty card in his own name?

A. I don't think so. I'm not positive about that.

Q. Mrs. Hernandez, did you ever receive a written notification on a cash register receipt that you would get when you would purchase something at Kroger in the Clute store, a notification on the receipt where it told you that a product you had previously bought a week or so ago or a couple of weeks ago may have been recalled or may have been contaminated?

A. Not that I know of.

Q. Have you ever received any type of telephone recorded message? I think they're called robo calls. I don't know if you're familiar with that, but a recorded telephone message where the recording informed you that records showed that you had purchased a product that had been recalled or may be contaminated?

A. No.

Q. Let's talk a little bit about your husband, Joe Hernandez. What was his full name, by the way?

A. His birth name was Joseph Jauregui Hernandez.

MR. SCHWARTZ: Spell the middle name.

Q. (BY MR. REUSS) Yes.

A. J-A-U-R-E-G-U-I.

Q. I would never have guessed that one. Okay. And how do you pronounce the middle name?

A. Jauregui.

Q. Jauregui. Okay. And what was Joe's date of birth?

A. 9/6/53.

Q. And his place of birth?

A. Freeport, Texas.

Q. Help me out with the geography. Where is that in relation to Houston?

A. Surfside Beach.

Q. Still not doing it.

MR. SCHWARTZ: Sixty-one miles. It's also in Brazoria County.

MR. REUSS: Oh, okay.

THE WITNESS: Yes.

MR. REUSS: Very good. Very good.

Q. (BY MR. REUSS) Did Joe live in the Brazoria County area throughout his entire life?

A. Yes.

Q. He had no prior marriages and no other

29

children, other than children with you. Is that correct?

MR. SCHWARTZ: Tell him about the child.

A. No prior marriages, but he does have a daughter.

Q. (BY MR. REUSS) Okay. And what is his daughter's name?

A. Allyson Sewell.

Q. A-L-L-I-S-O-N?

A. I think.

MR. SCHWARTZ: S-E-W-E-L-L. We have those adoption papers here --

MR. REUSS: Okay.

MR. SCHWARTZ: -- as exhibits to give to you if you want them.

MR. REUSS: Okay. Sure. Appreciate that.

MR. SCHWARTZ: Not adoption, but consent and the paternity and so forth.

MR. REUSS: Okay.

MR. SCHWARTZ: All the court documents.

Q. (BY MR. REUSS) Okay. How old is Allyson Sewell -- was Allyson Sewell -- is Allyson Sewell?

A. I don't know.

Q. And he is the father of Allyson Sewell?

30

A. Yes.

Q. Okay.

MR. SCHWARTZ: I think he admitted paternity.

Q. (BY MR. REUSS) Okay. So he admitted paternity?

A. Yes.

Q. Who is the mother of his daughter?

A. Cheryl Sewell.

Q. How do you spell Cheryl?

A. C-H-E-R-Y-L.

Q. Okay. Can you give me just some estimate of how old Allyson is? Is she an adult?

A. She's in her twenties.

Q. And it sounds like there was some litigation in association with paternity. Is that correct?

A. Litigation meaning?

MR. SCHWARTZ: More of an agreement, actually. The papers speak for themselves. She's not a lawyer.

MR. REUSS: Okay. I understand that.

Q. (BY MR. REUSS) When did -- when did Joe admit paternity of Allyson?

A. When the child was taken from the mother and the mother gave names of several men and Joe was one of

31

them. So he was called in for a DNA test.

Q. How long ago was that?

A. I'm not positive. I'm guessing maybe eight years.

Q. Okay. Okay. And how old was Allyson at the time approximately?

A. 15 when --

Q. Okay. So it sounds like Allison's now probably about 23, and some eight years ago when she was a teenager, Joe acknowledged paternity. Is that correct?

A. Yes.

Q. Okay. All right. Did Joe contribute to Allison's financial support?

A. Yes.

Q. After the acknowledgment of paternity?

A. Yes.

Q. How about before the acknowledgment of paternity?

A. No.

Q. And how much did he contribute to her support?

A. I don't know. I know he did because they took it from him, but I don't know how much it is.

Q. After the acknowledgment of paternity when Allyson was about 15, how often would Joe see his

32

daughter?

A. It varied because when we first found out, it was like an hour, then two hours, then a day, then a weekend. And it just gradually went that direction.

Q. Okay. And did he continue to contribute to Allison's financial support to her age 18?

A. I'm not sure.

Q. Do you know what Allyson does -- does today? Is she in school?

A. I know nothing about her.

Q. Okay. Other than Allyson Sewell, did Mr. Hernandez have any other children other than your two sons?

A. Not that I know of.

Q. Can you give me a brief description of Mr. Hernandez's educational background?

A. He ended up getting his GED.

Q. Okay. And when was that?

A. When?

Q. When did he get his GED?

A. I don't know.

Q. Okay. How old was he when he got his GED roughly?

A. Maybe in his forties.

Q. Okay. Did he attend high school?

33

A. Yes.

Q. And what high school did he attend?

A. Columbia High.

Q. The same one you attended. Right?

A. Yes.

Q. But he did not graduate. Is that so?

A. Correct.

Q. And then he came back and got his GED when he was in his forties?

A. Yes.

Q. Okay. Did he have any college?

A. No.

Q. Did he have any vocational school or technical school or any type of other formal educational background?

A. No.

Q. In September of 2011, was Mr. Hernandez employed?

A. No.

Q. Okay. Was he ever employed after September of 2011 up until the time he died?

A. No.

Q. When was he last employed?

A. I'm guessing it was early '80s.

Q. Okay. Now, you told me -- you got married in

34

1977?

A. '75.

Q. '75. Okay. So he was last employed about five years after you got married?

A. Approximately.

Q. Okay. And what did he do then?

A. He was an instrument technician.

Q. For what employer?

A. Several, in the plants.

Q. And what did he do?

A. Instrument technician?

Q. Uh-huh.

A. I am not -- I know they take instruments, and then they run the lines to the instruments that read the pressures of whatever's going through the lines, but that's as far as I can tell you.

Q. Okay. Was Mr. Hernandez disabled from employment?

A. Yes.

Q. Disabled from employment?

A. Yes.

Q. Okay. And what was the nature of his disability?

A. Back injury.

Q. When did he suffer the back injury that

35

rendered him disabled from employment?

A. It would be in the '80s. I -- I'm not good with years and dates. I don't --

Q. Do you know what the nature of the back injury was that rendered him disabled back in the '80s?

A. Like what happened to his back?

Q. Yes.

A. It had to do with his discs.

Q. He had a problem with his discs in his back?

A. Yes.

Q. Was there a particular incident or accident that caused that?

A. Yes.

Q. And is that an accident that he suffered while working as an instrument technician?

A. Yes.

Q. And after that accident, is it the case that he never was employed again?

A. Correct.

Q. Mr. Hernandez never served in the military, did he?

A. No.

Q. Now, I asked -- when we started the deposition, I asked you whether you had ever been a party to a lawsuit, and we started to talk a little bit

36

about Mr. Hernandez. And I understand that there may be some case files in relation to the paternity issue. Is that -- am I right on that?

A. Not any more.

Q. Not any more, but there had been?

A. Yes.

Q. Okay. Leaving that case aside, had Mr. Hernandez ever been a party to a lawsuit?

A. Yes.

Q. Besides this case, obviously?

A. Yes.

Q. Okay. Tell me about that.

MR. SCHWARTZ: I assume you're talking about civil, not criminal?

MR. REUSS: Yes. Yes.

A. Okay.

THE WITNESS: I don't know. Do you --

A. It's -- there's one incident where he was beat up by Brazoria County Sheriff's Department.

Q. (BY MR. REUSS) Okay. And when was that? When did that incident occur?

A. I don't know.

Q. Roughly?

A. In the '90s.

Q. Okay. Okay. And was he injured in that

37

incident?

A. He had bruises and scratches and stuff like that, bumps.

Q. Okay. And what -- what -- what occasioned his getting beat up by the sheriff's department?

A. What do you mean?

Q. Well, strike that. What happened that led to him getting beat up?

A. They picked him up for an incident with his family. He was in the back of the vehicle. They stopped at a park, opened the doors, and started beating on him.

Q. Okay. When you say an incident with his family, what -- what family are you referring to?

A. His, like, sisters, brother-in-laws, mom and dad; family issues.

Q. Okay. Had there been a fight with the family that preceded this incident of getting beat up?

A. There was arguments and stuff like that. I know -- I don't know why the sheriff's department beat him up.

Q. In any event, did he file a lawsuit over that?

A. Yes.

Q. In Brazoria County?

A. Yes.

38

Q. And what became of the lawsuit? How was that resolved?

A. They gave him some money.

Q. Okay. There was a settlement reached?

A. Yes.

Q. Okay. Do you know how much money he got?

A. I don't remember.

Q. Okay. And that was -- that was back in the 1990s. Is that so?

A. That's my guess. I would have to look at records to --

Q. I think I've seen some medical records that indicate that Mr. Hernandez had a father who died. Correct?

A. Yes.

Q. He died from lung cancer, and I think also --

A. I think it was heart attack, but I'm not sure.

Q. Okay. Is his mother still alive?

A. Yes.

Q. And what is her name?

A. Clotilde Hernandez.

Q. You've got to spell that one.

A. C-L-O-T-I-L-D-E, I believe is what it --

Q. Okay. Hernandez?

A. Yes.

39

Q. How old is she now?

A. I want to say 83.

Q. Is she in reasonably good health?

A. She's got health issues.

Q. Okay. And he has brothers and sisters or had brothers and sisters?

A. He has sisters.

Q. And what are the names of his sisters?

A. Virginia, Norma, Linda, Rita.

Q. No brothers?

A. No.

Q. Now, other than the claim that gave rise to the lawsuit against the sheriff's department -- strike that.

Going back to this back injury that led to the disability, did Mr. Hernandez file a workers' compensation claim based on that?

A. Yes.

Q. Okay. And did he receive some compensation from the state?

A. Yes.

Q. Did he also ever file a claim for Social Security Disability benefits?

A. Yes.

Q. And did he receive those?

40

A. Yes.

Q. Other than the incident with the sheriff's department, which actually led to a suit being filed, did Mr. Hernandez ever make any claim for bodily injury against any -- any person that did not involve the filing of a lawsuit?

I'm thinking of anything from an automobile accident, rear-ender, slip and fall in a store where a claim was made and maybe -- and settled but a lawsuit was not filed?

A. Not that I know of.

Q. Was he ever involved in a motor vehicle accident in which he was injured?

A. Yes.

Q. Okay. And when was that?

A. It was before we were dating.

Q. Oh, a long time ago?

A. Yes. I mean, he's been in another accident. I mean it was just somebody rear-ended him in a parking lot.

Q. But any -- any accident in which he was injured and made a claim against anybody for money?

A. That one in the parking lot --

Q. Okay.

A. -- but they did nothing.

READING COPY NOT FOR SIGNATURE

45

Q. Okay. Okay. And the back injuries, you think the hospital -- the hospitalization for the exacerbation of back injuries, at least one was at Park Plaza?

A. I'm guessing. Yes.

Q. Okay. All right. Other than the toe surgery, the gallbladder surgery, and the exacerbation of his back, which led to him going into the hospital as an admitted patient, can you think of any other incidents in which he was admitted to a hospital as a patient?

A. Oh --

Q. Prior to October of 2011.

A. I -- I believe this was before that. Of course, here we go again, another family incident, but this time it was on my side of the family.

The brother-in-law coming -- we thought coming out of the driveway. Joe standing on the side by the culvert. The man, instead of driving out, turns his wheel towards Joe, knocks him into the ditch. So they took him to the hospital for observation.

Q. Okay. Did he stay overnight?

A. Yes.

Q. Okay. Was he released the next day?

A. I'm not sure if he was there just overnight or two because they had to do x-rays because he landed on

46

his back and his head, but he also, where he went down, scraped up his legs and his knees.

Q. Okay. All right. If we focus on September 3rd of 2011, that -- that specific date -- strike that.

In September of 2011, at that period of time, was Mr. Hernandez under the care of any doctor for any medical condition?

A. Yes.

Q. Would that be Dr. Burns?

A. Yes.

Q. Any other doctor besides Burns?

A. Yes.

Q. Okay. Well, tell me about Dr. Burns. What was -- what was Joe seeing Dr. Burns for in or around -- in or around September of 2011?

A. Mostly for his medications, like his sleeping medication, blood pressure, that type of stuff.

Q. Okay. Am I correct that in October of 2011, Mr. Hernandez weighed between 450 and 525 pounds?

A. Yes.

Q. Okay. How long had he weighed, you know, let's say, more than 400 pounds? Several years?

A. Lots of years, yes.

Q. And did Dr. Burns tell Mr. Hernandez that he needed to lose weight?

47

A. Oh, yes. They all did.

Q. And that -- did he tell him that he could -- he could die as a result of his obesity?

A. No.

Q. In September of 2011, was Mr. Hernandez under any medical treatment for obesity?

A. No.

Q. Dr. Burns was treating him for sleep issues?

A. Uh-huh.

Q. Did he have sleep --

A. Yes.

Q. -- sleep apnea?

A. Yes.

Q. Did he have -- did he have a CPAP machine?

A. BiPAP machine.

Q. BiPAP machine. Did he use it?

A. Always.

Q. And what was the reason for the use of the BiPAP machine?

A. He started having issues, like going to the bathroom in the middle of the night and falling asleep and falling. And it just didn't get better, so he went to a doctor.

They decided to do a sleep study. They say that he had stopped breathing way high, numerous

48

times in that sleep study. Immediately put him on the BiPAP machine.

Q. Okay. And did Dr. -- did Dr. Burns put him on the BiPAP machine?

A. No.

Q. Did Burns refer him out to a sleep specialist?

A. No. This was many years ago before Dr. Burns. Oh, what was his name? I would have to look back, but this doctor was from Houston, and he's moved off now, but he's the one that put him on the BiPAP.

Q. Okay. But in September of 2011, was Dr. Burns managing Mr. Hernandez's sleep problems to some extent?

A. As far as sleeping medication.

Q. Okay. What sleeping medication was he being given?

A. I couldn't tell you. You could look on his medical records.

Q. Okay. And how about the BiPAP machine; was that something that Dr. Burns put him on?

A. No. That was many years ago with the doctor that originally put him on it.

Q. Okay. Did he continue to use the BiPAP machine from when he was first put on it many years ago up until the time of his death?

A. Yes.

REDUCING COPY FOR NO SIGNATURE

53

Q. I'm jumping ahead, which is a bad thing to do. The subject cantaloupe was purchased on September 3rd, 2011. Correct?

A. Yes.

Q. When did Mr. Hernandez eat that cantaloupe?

A. On his birthday, the 6th, 9/6.

Q. 9/6. Okay. In relation to that date, the date on which he ate the cantaloupe, can you tell me when this -- these problems of the perianal or the itching around the anus and the problem with the worms and the eggs in the feces first developed?

A. It was several days after. There was other previous things that happened before that.

Q. Okay. Like what?

A. He started with stomach issues, but he -- he was having fever, diarrhea. It got to the point where he couldn't control that or his urine. Then he started getting headaches. I -- he was shivering. Those are the main issues he started having before the worms came.

Q. Okay. So the fever, the diarrhea. Was it urine incontinence, that he could not urinate?

A. No. He couldn't stop from it. He -- he would think about going to the bathroom, whether it was diarrhea or urinating, and it would just happen.

54

Q. Okay. So to -- we're jumping ahead a little bit here, but you're telling me that the fever, the diarrhea, the problem with excessive urination, the headaches and the shivering, these were symptoms that developed after he consumed the cantaloupe on September 6th. Correct?

A. Yes.

Q. And these were the constellation of symptoms that developed first. Correct?

A. Yes.

Q. And then it was later that the itching around the anus and the worms and eggs in the feces arose. Is that correct?

A. Yes.

Q. Was Mr. Hernandez receiving pain medication --

A. Yes.

Q. -- in September of 2011?

A. Yes.

Q. And what type of medication?

A. I don't remember the name of it.

Q. And who was prescribing that?

A. Well, Deleon had been doing that. I want to say hydrocodone, but I'm not positive.

Q. Okay. And where was Mr. Hernandez experiencing pain?

55

A. At this point it's always been his back, but, of course, with age, you know, his knees and, you know, joints and stuff just -- you know, just age and weight and all that.

Q. Okay. But is it -- it's true, is it not, that in September of 2011 he was receiving pain medication for musculoskeletal issues that you don't associate with the cantaloupe.

A. Right.

Q. Correct?

A. He had -- right.

Q. Okay. And you think it might have been hydro-- what did you tell me?

A. Hydrocort-- hydrocortisone, I believe. I do know also that after all this -- this -- these incidents were happening, his stomach was always painful, and they were giving him medications for his stomach. I can't tell you what the name of the stuff was.

Q. Okay. We may -- we may see that as we go forward here. So prior to September 3rd, 2011, I understand that Mr. Hernandez was taking prescription medication for sleep issues. Correct?

A. Yes.

Q. Prescription medication for hypertension.

56

Correct?

A. Yes.

Q. Prescription pain medication. Correct?

A. Yes.

Q. Any other prescription medications prior to 9/3/11?

A. Not that I can think of. I mean, there might be some. I just don't remember.

Q. Okay. All right. In September of 2011, was Mr. -- was Dr. Burns your husband's primary care physician, family doctor?

A. Yes.

Q. Okay. And he would go to Dr. Burns for, among other things, routine medical issues, that kind of thing?

A. Right.

Q. If he had the flu, he'd probably go see Dr. Burns?

A. Yes.

Q. Okay. And if he saw a doctor, it would be Burns probably --

A. (Witness nods head affirmatively.)

Q. -- for minor medical stuff. Correct?

A. Yes.

Q. Okay. Other than minor medical conditions

PENDING COPY FOR SIGNATURE

57

like cough, flu, that kind of stuff, prior to September 3rd of 2011, did -- well, first of all, your husband was treating for the sleep issues. Correct?

A. Yes.

Q. He was treating for the high blood pressure. Correct?

A. Yes.

Q. He was treating for pain, but that wasn't through Burns' office; that was through Deleon's office?

A. Right.

Q. Okay. If we go back to Burns, prior to 9/3/11, other than routine medical issues, and the sleep and the high blood pressure, were they any other medical conditions that he ever saw Dr. Burns for?

MR. SCHWARTZ: Before this?

MR. REUSS: Yeah.

Q. (BY MR. REUSS) Before 9/3 of '11.

A. I don't know.

Q. How long had --

A. I don't know.

Q. How long had Dr. Burns been his primary care physician prior to September of 2011?

A. Two, three years. Two, three years.

Q. Okay.

58

A. Not long.

Q. So not that long. And who was his primary care physician before that? Did he have one?

A. There was, but I could not even tell you what her name was.

Q. It was a female doctor?

A. Yes. In Lake Jackson, but I -- I don't have any idea who she was.

Q. Okay. And how long did she serve as his primary care physician?

A. Maybe a couple of years also. Maybe. I'm not sure. He -- he wasn't one to see much on primary because his issues mostly were his back injuries and his sleep apnea.

Q. Okay. Did Dr. Burns ever refer out Mr. Hernandez to a specialist?

A. Like a gastroenterologist or something like that?

Q. Well, let's start with that. Yeah. Well, again, prior to September of 2011.

A. Oh.

Q. We'll get into the other stuff later.

A. Okay. Not that I know of.

Q. Had your husband ever seen a cardiologist before September of 2011?

59

A. No, not for a cardio -- not for a heart issue or anything, no.

Q. For even a routine examination?

A. I know that they've done the -- oh, sorry -- heart tests like during hospital stays or something, but never go and see a heart doctor or anything like that.

Q. Did your husband ever have an echocardiogram, where they looked at the structure, the architecture of his heart?

A. I think so.

Q. Do you remember when that was?

A. No way. No, but it was amazing. Whenever he did have anything done to check his insides, everything was always good.

Q. Because I assume, and correct me if I'm wrong, that Dr. Burns probably told him that his obesity put him at high risk for heart issues?

A. Yes. They all do.

Q. Did he take any heart medication at any time?

A. No.

Q. He didn't have a pacemaker?

A. Nope.

Q. He didn't have any electrical issues with his heart?

60

A. No.

Q. He never made a visit to a heart cath lab?

A. No.

Q. Never had a heart attack?

A. No.

Q. Okay.

(Mr. Musslewhite entered the deposition.)

MR. REUSS: Let's go off the record.

THE VIDEOGRAPHER: The time now is 10:51 a.m. We are going off the record.

(Mr. George Edwards entered the deposition.)

(Break.)

THE VIDEOGRAPHER: The time is now 11:08. We are going back on the record.

MR. SCHWARTZ: You wanted to make a correction?

A. Yes. That there was a question about purchasing at other stores.

Q. Uh-huh.

A. And I had mentioned the two Stewart's, Wal-Mart, and Kroger's. And at the time, I had purchased cantaloupe at Kroger's but did not straight out say I did not purchase cantaloupe at Wal-Mart, so that -- that time I did not purchase cantaloupe at

READ COPY FOR ORIGINAL SIGNATURE

61

Wal-Mart. That was Kroger.

Q. Okay. I think I may have asked you whether you had purchased cantaloupe from Wal-Mart in August or September of 2011, but let me just ask that correctly.

Do you know one way or the other whether you purchased any cantaloupe from Wal-Mart in August or September of 2011?

A. No.

Q. You know that you did not?

A. Correct.

Q. How do you know that?

A. Because we don't purchase unless they're on sale, and I don't recall ever seeing that. And when Kroger's had theirs, that's when we had gone and purchased some.

Q. Okay. Do you believe that the cantaloupe that you purchased on September the 3rd, 2011, which is reflected in Exhibit 1, caused Mr. Hernandez's illness?

A. Yes.

Q. Can you tell me the last date prior to September 3rd of 2011 -- if I said 2011, I meant -- if I said 2001, I meant 2011. You understood that?

A. Okay.

Q. Correct?

A. Okay. Yes.

62

MR. SCHWARTZ: I think it's all been 2011.

MR. REUSS: It is, but I thought I misspoke. Let me ask it again.

Q. (BY MR. REUSS) You believe that the cantaloupe purchased on September 3rd, 2011 from the Kroger store in Clute caused Mr. Hernandez to become ill?

A. Yes.

Q. Okay. Do you know when you last purchased cantaloupe from the Kroger store in Clute prior to September 3rd, 2011?

A. No.

Q. Did you or your husband ever purchase cantaloupe from the Kroger store in Clute after September 3rd, 2011?

A. No.

Q. Do you still shop at the Kroger store in Clute?

A. Yes.

Q. Is it still one of the three or four stores that you do your grocery shopping at?

A. Yes.

Q. Was it the case that you did -- strike that.

As among the Kroger store in Clute, the

63

Wal-Mart store, and the two Stewart stores, in September of 2011, did you do most of your grocery shopping at the Kroger store?

A. No.

Q. Did you do most of it at Wal-Mart?

A. Yes.

Q. If you could give me like a percentage breakdown of your shopping in September of 2011, what percentage of your grocery shopping was at Wal-Mart, Kroger, or the two Stewart's?

MR. SCHWARTZ: By grocery, you're including pharmaceuticals.

MR. REUSS: Yes, everything.

MR. SCHWARTZ: Toiletries, not that there's a distinction.

MR. REUSS: Yes, yes. And then we'll move into that distinction, but yes.

A. 75 percent at Wal-Mart. Probably 20 percent at the two Stewart stores, and then the -- because it's very little at Kroger because, as I said earlier, I only go there because of sales.

Q. (BY MR. REUSS) Okay. What percentage of your purchase of produce did you make at Wal-Mart versus Kroger versus Stewart's in September of 2011?

A. We don't purchase much fruit because it's so

64

expensive to begin with, but most of it would be probably Wal-Mart compared to the others.

Q. And if I asked the same question relative to cantaloupe specifically, prior to September of 2011, what percentage of your purchases of cantaloupe were made at Wal-Mart versus Kroger versus the two Stewart's?

A. Well, I don't know. Like I said, very little at Kroger because that was only our sales that would get us there. So the rest of -- anything we purchased would be mostly at Wal-Mart.

And then I would -- daily stuff would be at Stewart's because it's in our neighbor -- you know, when I drive through to go to work and go home.

Q. Is it fair to say that prior to September 3 of 2011 most of your cantaloupe purchases were made either at Wal-Mart or the two Stewart stores?

MR. SCHWARTZ: Objection. Assumes you bought cantaloupe all the time.

A. I know. I just can't say cantaloupe, yes. I can say fruit, but, you know, cantaloupe wasn't like our main fruit, and we don't purchase fruit very often because it just cost too much.

Q. (BY MR. REUSS) Well, let me --

A. But I would still say Wal-Mart was not -- you

READING COPY - NOT FOR SIGNATURE

16

65

know, that's where I buy my groceries.

Q. Did you ever purchase cantaloupe from Wal-Mart before September 3 of 2011?

A. I would say yes.

MR. SCHWARTZ: You could check your records just like you have this record --

THE WITNESS: Right.

MR. SCHWARTZ: -- for those two months and answer without guessing about it. Right?

THE WITNESS: True. Yes.

MR. SCHWARTZ: Do that.

Q. (BY MR. REUSS) Do you know one way or the other whether you ever purchased cantaloupe from Kroger prior to September 3 of 2011?

A. I -- I can't -- I don't know.

Q. Okay. We know you did on September 3 of 2011.

A. Yes.

Q. But you don't know whether you did before then?

A. Right.

Q. And you know that you did not after that?

A. Right.

Q. And was the cantaloupe that you purchased on September 3, 2011, was it on sale?

MR. SCHWARTZ: It's two dollars.

66

A. I -- I think so, because it was --

Q. (BY MR. REUSS) It's two dollars.

A. I think so.

Q. Now, I think we've established that prior to September of 2011, you had been seeing -- excuse me -- Mr. Hernandez had been seeing Dr. Burns for some ongoing issues with sleep and with high blood pressure. Dr. Deleon for pain management issues.

A. Uh-huh.

Q. And then in connection with Deleon, sometimes he would see Sherry Walls, who also could prescribe medications. Correct?

A. Yes.

Q. Did she ever prescribe pain medications?

A. I don't know.

Q. Can you think of any other doctors that your husband saw on any kind of basis prior to September of 2011, say if we go back 10 years?

A. Oh.

Q. It sounds like --

A. There's a lot of doctors.

Q. All right. Any specialists?

A. There was the sleep study doctor.

Q. Okay. We talked about that.

A. And I can't remember his name. That was his

67

main issue, was the sleep apnea, and then his back, but as far as specialists, that was it.

Q. Was he followed by any type of an orthopedic doctor for his back issues?

A. I don't think so.

Q. And you told us you don't recall him being seen by a cardiologist for any specific heart problems?

A. Never.

Q. Now, let me ask you, and this is sort of a list of issues that I want to go through very quickly if we can.

Prior to September of 2011, was Mr. Hernandez ever diagnosed with or treated for -- and I'm going to give you a number of gastrointestinal conditions: The first one is Crohn's disease?

A. No.

Q. Irritable bowel syndrome?

A. Not that I know of.

Q. Any type of gastritis?

A. No.

Q. Any type of mass that they found in his abdomen or in his bowel?

A. No.

Q. Any form of cancer?

A. No.

68

Q. Had he been treated for or diagnosed with hemorrhoids prior to September of 2011?

A. He had -- I want to say he had hemorrhoids, but that was a long time ago.

Q. Okay.

A. I couldn't tell you what year, but it was a long time ago.

Q. He was noted to have internal hemorrhoids after September of 2011, I think maybe by --

A. Polyps?

Q. Yes. Yes. Well, he -- he was noted to have polyps and I think he was diagnosed with hemorrhoids, but if we focus our attention on prior to September of 2011, do you know if he was ever diagnosed or treated for hemorrhoids?

A. Many years ago, yes.

Q. Years ago. Okay. And do you know who the doctor was who treated him for that?

A. No.

Q. Ever treated for stomach ulcers prior to September of 2011?

A. No.

Q. Ever had treated for abdominal pain prior to September of 2011?

A. No.

READING COPY FOR SIGNATURE

69

Q. Okay. Mrs. Hernandez, in addition to Exhibit 1, the transaction detail that references the September 3rd, 2011 cantaloupe purchase, have you located any sales receipts or credit or debit card statements or any other documents reflecting that transaction?

A. No.

Q. Do you remember your visit to the Kroger store on September 3rd, 2011?

A. Yes.

Q. Was your husband with you?

A. Yes.

Q. When you two would go shopping, either at Kroger or at Wal-Mart, would you typically go together?

A. Yes.

Q. Or Stewart's?

A. Yes.

Q. Okay. Do you remember anything special about that visit?

A. We went because of the sales and because his birthday was coming up, and we were going to have a party.

Q. All right. Was the -- was the cantaloupe purchased for his birthday?

A. Yes.

70

Q. Strike that.

A. Well --

Q. For the birthday party?

A. Oh, no.

Q. Okay. Did you purchase other grocery items -- well, we have a --

A. Yes.

Q. -- list of them.
Were those grocery items that would be eaten in connection with his birthday party?

A. Yes.

Q. All right. And you remember that he ate the cantaloupe on September 6th, and that recollection is triggered because that was his birthday?

A. Yes.

Q. Do you remember talking to any store employee during that visit to the store --

A. No.

Q. -- that day?
Do you remember the time of day --

A. No.

Q. -- that you were there?
Okay. How many cantaloupes did you purchase that day?

A. Just one.

71

Q. It was a whole cantaloupe?

A. Yes.

Q. In other words, it hadn't been cut up and put in a fruit tray or a --

A. No.

Q. -- a fruit cup? It was a whole cantaloupe?

A. Yes.

Q. And where was it displayed?

A. I just know it was in some container. It had a lot of cantaloupe in it.

Q. Okay. The container had only cantaloupe in it?

A. Yes.

Q. Okay. Was it in like a bin on the floor of the store?

A. Right.

Q. It was not in a refrigerated case. Right?

A. No.

Q. Okay. Do you know the area of origin of the cantaloupe? And by that I mean, do you know whether it was a California grown cantaloupe or a Colorado grown cantaloupe?

A. I did not pay attention, no.

Q. Was there a sticker on the cantaloupe, on the outside skin of the cantaloupe?

72

A. I don't remember.

Q. It wasn't in a package, per se, though. Correct?

A. No.

Q. So you could see and you could actually feel the -- the netted rind of the cantaloupe?

A. Yes.

Q. And whether there was a -- what we call PLU sticker or any type of sticker on the cantaloupe, you just don't remember?

A. I don't.

MR. SCHWARTZ: What's the PLU acronym for?

MR. REUSS: I used to know.

MR. SCHWARTZ: If it's a foreign country, there has to be a sticker on the foreign country of origin.

MR. REUSS: Right. Right. That's not the issue, though, for PLU. I don't -- I'm surprised I remembered PLU.

MR. SCHWARTZ: I just didn't want to sound dumb.

A. Sometimes they have like a bar code.

Q. (BY MR. REUSS) Right. But you remember seeing that?

READING COPY FOR ORIGINAL FOR SIGNATURE

73

A. No.

Q. Okay.

A. I'm just — but you-all are talking about —

Q. Right. Exactly. Was there any marking on the cantaloupe, a sticker or anything that indicated a use by date or a sell by date?

A. I don't remember anything on there.

Q. Now, I assume that when you shop for produce, Mrs. Hernandez, you look at — whether it's bananas or apples or oranges or cantaloupe, you look at the item and you compare it to other items in the case to make sure you get one that looks good?

A. Yes.

Q. Okay. From what you recall, did this cantaloupe look good?

A. Yes.

Q. Did it have the typical color you associate with cantaloupe?

A. Yes.

Q. In other words, it didn't look like it was discolored in any way?

A. No.

Q. You didn't notice any flaws or imperfections in the cantaloupe?

A. No.

74

Q. Do you remember how you paid for the cantaloupe? By that, I mean did you use a credit card or a debit card or a check or cash?

A. I don't remember.

Q. Okay. You just don't recall?

A. Right.

Q. All right. We've covered a lot of territory already, so I'm going to try to avoid repeating that.

Now, this purchase of the cantaloupe and the other food items referenced on Exhibit 1 was three days before Mr. Hernandez's birthday. Correct?

A. Yes.

Q. Do you remember driving home with the groceries that you had purchased?

A. Yes.

Q. Okay. And what did you do when you got home with the groceries?

A. Put it all away.

Q. Okay. You go straight home?

A. Yes.

Q. It looks like you purchased some yogurt. Is that correct?

A. I don't remember.

Q. Okay. Do you — do you have a distinct recollection of anything else you purchased that day

75

besides the cantaloupe?

A. We purchased brisket. We purchased —

MR. SCHWARTZ: Here's — this is the same exhibit that we all have.

THE WITNESS: Okay.

A. I believe some stuff to make some dessert. Yeah. The cherry pie filling and stuff. Barbecue sauce. Uh-huh. Yeah, all that was because of the party we had.

Q. (BY MR. REUSS) Did you purchase anything that was perishable, that required refrigeration?

A. Besides — let's see. The brisket.

Q. And are you satisfied that you drove directly home and put the brisket under refrigeration?

A. Oh, yes. Any time we have meats, eggs, milk, we have to get home and — because it takes us almost 30 minutes from where we purchase to get home.

Q. Okay. Let's go back to the cantaloupe. What did you do with the cantaloupe when you got home?

A. Refrigerate.

Q. Okay. Did you cut it up at all?

A. No.

Q. So it was in the same condition sitting in your refrigerator as it was sitting in the bin at the store?

76

A. Yes.

Q. The cantaloupe was eaten by Mr. Hernandez on September the 6th. Correct?

A. Yes.

Q. And nobody else had any of the cantaloupe. Correct?

A. No.

Q. How much of the cantaloupe did he eat?

A. All of it.

Q. Okay. Who cut the cantaloupe up?

A. I did.

Q. And how did you cut it up?

A. Slice — cut it in half, take the seeds out, and then slice it and take it off the rind.

Q. Okay. You didn't halve it, if that's a verb, cut it in half and open it up into two separate halves, and he ate from those. Correct?

A. No.

Q. Did you take the rind off first?

A. No. Take the seeds out first, and then slice it, and then cut it off the rind individually.

Q. Okay. So — so would that leave you, then, with several thin slices of cantaloupe?

A. Yes, several pieces.

Q. Okay. And did each of these pieces still have

READING COPY FOR SIGNATURE

77

the rind on them?

A. No.

Q. The rind was off?

A. Yes.

Q. Okay. And he ate the whole cantaloupe?

A. Yes.

Q. Did he indicate to you that the cantaloupe tasted funny in any way?

A. No.

Q. Or that it smelled funny in any way?

A. No.

Q. When you cut it up, you were able to see the inside part of the cantaloupe?

A. Yes.

Q. Did it look normal?

A. Yes.

Q. You didn't notice any flaws or imperfections in it?

A. No.

Q. We -- we talked earlier, Mrs. Hernandez, about the progression of symptoms. And the first constellation of symptoms that happened you told me involved -- give me a second -- if I recall, involved fever and chills. Is that correct?

A. Yes.

78

Q. And diarrhea developed?

A. Uh-huh.

MR. SCHWARTZ: You have to say yes or no.

MR. REUSS: Oh, sorry.

A. Yes.

MR. SCHWARTZ: You can't say uh-huh because it reads the same --

A. I'm sorry. Yes.

Q. (BY MR. REUSS) So we have fever, diarrhea, chills. What other symptoms?

A. He also couldn't keep from urinating on himself and --

Q. Excessive urination?

A. Yes. Eventually he started getting headaches also.

Q. Okay. And that constellation of symptoms occurred before the pruritus ani and the -- the worms and eggs in the feces that we talked about. Correct?

A. Yes.

Q. Okay. Going back to that constellation of symptoms that first developed, when did those symptoms first develop in relation to September 6th?

A. Two or three days.

Q. Two or three days?

A. (Witness nods head affirmatively.)

79

Q. Okay. And was there a particular symptom or set of symptoms that developed first among that group?

A. If I remember correctly, he was suddenly running fever and had chills, and eventually this diarrhea started and then the urinating. It was just like -- and it all happened so quickly. I don't know.

Q. But it began about two or three days after he consumed the cantaloupe?

A. Yes.

Q. It began about two or three days after his birthday, which was September the 6th?

A. Right.

Q. When did the itching around the anus onset?

A. I don't remember. I -- I know there was some time between all this other symptoms he had. I'm not sure.

Q. Okay. I see a visit indication in the records of a visit to Sherry Wall on October 11th of 2011 in which there's a diagnosis of the worms --

A. Okay.

Q. -- and the eggs in the stool and also the itching around the anus. Do you remember him going to see Sherry Wall on October 11th?

A. Yes.

Q. When, in relation to that, if we go back, did

80

these two conditions first develop, if you can -- if that helps you trigger your recollection; the itching around the anus and the worms and the eggs in the feces?

A. Okay. When he went to go see her, it had all started maybe five days prior. And this is just an estimate because when all that began, and then he had the worms in his feces and he called the doctor, and then they told him to come in.

Q. Okay. So there was a period of time after that first group of symptoms that you described happened before the itching around the anus and the worms and the eggs and the feces. Correct?

A. Right.

Q. And in between those two periods of time, did he not seek medical treatment?

A. He -- did he go -- he -- I'm trying to remember if he did or not. I don't remember who he talked to. I know that we -- he and I were trying -- thinking it was just a regular stomach bug or something.

I tried to get him to take Pepto and stuff like that, but I can't remember the first time he actually talked to a physician about it.

Q. Who was the first physician he talked to about

PRELIMINARY COPY - NOT FOR SIGNATURE

81

his symptoms or first health care professional because it may have been Mrs. -- Ms. Wall?

A. I have no idea.

Q. Okay.

A. There was too many people involved in it, too many doctors, and I would have to look at their bills to see who was first.

Q. Okay. All right. We understand, Mrs. Hernandez, that -- and I've seen, that there was a listeria test that was ordered by Dr. Burns.

A. Okay.

Q. And was administered in -- I think it was October of 2012. This is about 13 months after the consumption of the cantaloupe.

A. Right.

Q. Do you remember generally that there was a listeria test?

A. Yes.

Q. And do you remember a listeria test that was ordered by Dr. Burns and took place sometime in October of 2012 or thereabouts?

A. I know it was done. I can't tell you what date, but, yes, Dr. Burns.

Q. To your -- and, again, maybe my -- my medical records are not complete, but to your knowledge was

82

there any listeria test that was performed on your husband in 2011?

A. Not that I can remember.

MR. SCHWARTZ: Well, these records -- you don't know what's in all these records.

THE WITNESS: Right.

MR. SCHWARTZ: There were three different listeria tests done. And we've got -- even though you didn't subpoena anything, we've got them all here --

MR. REUSS: Okay.

MR. SCHWARTZ: -- or we can furnish them two weeks from now in response to a request for production --

MR. REUSS: Okay. That's --

MR. SCHWARTZ: -- whatever way you want it.

MR. REUSS: I'll take a look at them.

MR. SCHWARTZ: I have them all here to give you an opportunity.

MR. REUSS: No. We will. We will. I appreciate that. Were there -- are there any listeria tests in 2011?

MR. SCHWARTZ: I'd have to look at the dates. I didn't memorize --

MR. REUSS: Okay. All right. We'll move

83

on. We'll move on.

Q. (BY MR. REUSS) When your husband would go in and see Dr. Burns after he'd started developing these symptoms, and he saw Dr. Burns on -- I assume many occasions or a number of occasions after he started to develop these symptoms?

A. Yes.

Q. Okay. Would you accompany him in the examination room?

A. At times.

Q. Okay. And he also saw -- again, we're jumping ahead a little bit, but he saw a gastroenterologist, Dr. Sweatt. Do you know who I'm talking about?

A. Yes.

Q. And what -- why did he go see Dr. Sweatt?

A. Because of his stomach issues.

Q. Okay. And Dr. Sweatt performed a colonoscopy, I think?

A. Yes.

Q. And do you remember being told what the results of that were?

A. I remember seeing the results but --

MR. SCHWARTZ: For the record, Dr. Woc from Baylor clinic on October -- in October of 2011 -- the date's not specified, I don't think here -- did a

84

listeria test. And there's a third one, but I didn't want to interrupt you.

MR. REUSS: May I see it?

MR. SCHWARTZ: That's Exhibit 33 series, records from Baylor Clinic Infectious Disease on Main Street, 6620 Main Street, Suite 1375.

MR. REUSS: Okay.

MR. SCHWARTZ: And I don't know the spelling. I think there's a better spelling of his name here somewhere.

MR. REUSS: All right. We'll move on.

MR. SCHWARTZ: Excuse the interruption.

MR. REUSS: No, not a problem.

Q. (BY MR. REUSS) Mrs. Hernandez, let's -- let's move on, if we could. Did Dr. George Deleon see your husband for any of the problems that he associated with the cantaloupe?

A. I don't remember.

Q. Okay. Your husband was also seen by a doctor -- and I'm going to butcher his name, but I think it's pronounced Dr. Nizam (phonetic) Charafeddine, who performed a colonoscopy and biopsy?

A. Yes.

Q. And I think, was it that doctor -- I won't be able to pronounce his name a second time -- who

READING COPY FOR ORIGINAL FOR SIGNATURE

85

diagnosed the polyps in the colon?

A. Charafeddine, I believe is his name. I'm not sure which doctor found the polyps.

Q. Okay.

A. But the reports -- I mean, I know that the reports will tell you.

Q. Okay.

MR. SCHWARTZ: And that's our Exhibit 24. Dr. -- and I'll spell the name: N-I-Z-A-R C-H-A-R-A-F-E-D-I-N-E (sic). And your guess is as good as mine how to pronounce it.

MR. REUSS: All right.

Q. (BY MR. REUSS) There's another doctor, a Dr. James Sims from the Diagnostic Clinic of Houston. I think he may have -- I think he may have been an infectious disease doctor, but --

A. Yes.

Q. Okay. And do you remember your husband going to see him?

A. I do remember him going.

Q. And, again, just generally, do you remember -- from my note, indication that he did a liver panel and a chest x-ray, and a Crohn's disease workup of some sort.

A. Uh-huh.

86

Q. And then some immunoglobulin tests. You may not be familiar with that, but, again, you generally remember this doctor being involved in treating your husband?

A. Yes.

Q. And what was your understanding of Dr. Sims' impression --

A. The only thing --

Q. -- of your husband's condition?

A. -- I remember of him is that Crohn's disease test, that they said he did not have.

Q. Did any doctor tell you or your husband that, in his opinion, your husband had become infected with listeria as a result of the consumption of the cantaloupe on September 6th of 2011?

A. Yes. There was mention.

Q. Which doctor told you or your husband that he believed that your husband had been infected with listeria from the consumption of the cantaloupe?

A. I'm not sure which one did. I know Dr. Burns talked to Joe about it.

MR. SCHWARTZ: No. That you heard directly.

A. That I heard? No. I don't know because I did not hear it from them. That would have been Joe.

87

Q. (BY MR. REUSS) Okay. Did your husband ever tell you that a particular doctor had told him that his -- that he had been infected with listeria from the consumption of the cantaloupe?

A. Joe had mentioned it, but I can't tell you which one it was.

Q. Mrs. Hernandez, your husband passed away on June the 4th of 2014?

A. Yes.

Q. Okay. And what was the cause of his death?

A. Natural causes.

Q. Okay. Again, I understand from our earlier discussion that that was a little bit of a turbulent time for you in the household.

A. Yeah.

Q. Let me ask you -- yeah. Are you okay?

A. Yeah, I'll be okay. Go ahead.

Q. You want a glass of water or anything?

A. No.

Q. Okay. Where did he -- he die? Did he pass --

A. At home.

Q. At home? Okay. Was he hospitalized during his final illness?

A. No.

Q. When you say natural causes, did he have a

88

heart attack?

A. No.

Q. Was he under any medical treatment at the time?

A. No. Just the same regular stuff, the -- the high blood pressure, the sleep apnea.

MR. SCHWARTZ: Speak up. We're not hearing you.

A. Oh, the high blood pressure, the sleep apnea, all the usual things he's been living with for several years.

Q. (BY MR. REUSS) Okay. Did a doctor sign a death certificate in relation to his death?

A. I guess. It was -- he was sent to Galveston. I mean, they -- they're -- the judge that came to pronounce him sent him to Galveston for an autopsy.

Q. Okay. I was going to ask you about that. So there was an autopsy performed?

A. Yes.

Q. Okay. And do you know what the results of the autopsy were in relation to his specific cause of death?

A. If I remember correctly, all they said was something about obes-- obesity.

Q. Did he -- I don't know how to ask this: Did

COPY - NOT FOR SIGNATURE

89

he die suddenly, or did he go through a final illness?

A. It was sudden to -- to us.

Q. Was he being treated by any doctor for any final illness prior to his passing?

A. No.

Q. When you say a judge came, is that -- I'm not familiar with your procedure here. Is it like a justice --

MR. SCHWARTZ: That's for autopsies.

A. County.

Q. Okay.

A. County judge. I believe it was -- I want to say it was Judge Fox, but I don't know.

MR. SCHWARTZ: They're not necessarily a lawyer. A county judge doesn't have to be a lawyer in Texas.

MR. REUSS: Oh, okay.

MR. SCHWARTZ: It's an administrative. They run the county, the Brazoria County.

MR. REUSS: Okay. And they can order --

MR. SCHWARTZ: Why they went to -- why they went to Galveston, maybe they don't have facilities in Brazoria.

Q. (BY MR. REUSS) Did you say -- I thought -- was it Houston or Galveston?

90

A. Galveston.

MR. SCHWARTZ: Galveston has, of course, the Medical Center. They have more --

Q. (BY MR. REUSS) When did your husband last see a doctor before the date of his death?

A. I don't know.

Q. Has any doctor indicated to you that he or she believes that your husband's death was caused or contributed to by the consumption of the cantaloupe on September 6th of 2011?

A. I haven't talked to anybody.

Q. Okay. So up to this point, nobody's told you that?

A. No.

Q. Mrs. Hernandez, what sources of income did you or your husband have in September of 2011?

A. He's on Social Security Disability.

Q. We talked about that.

MR. SCHWARTZ: Here's the tax returns, if you want them.

MR. REUSS: Thank you.

A. And I work at the Columbia-Brazoria --

MR. SCHWARTZ: There's three sets.

A. -- ISD.

MR. SCHWARTZ: I'll give the court

91

reporter the originals.

MR. REUSS: Okay.

MR. SCHWARTZ: Let me state for the record. Exhibit 44 are plaintiffs' -- is for calendar year 2012 return. Here's a copy for you.

MR. REUSS: Thank you.

MR. SCHWARTZ: 2014 is Exhibit 43. None of these were subpoenaed. They've been voluntarily produced. There's that. And then Exhibit 42 is her payroll for this year so far from the school district that -- Columbia --

THE WITNESS: Brazoria.

MR. SCHWARTZ: -- Brazoria ISD.

MR. REUSS: Okay. And thank you, Norman.

Q. (BY MR. REUSS) And -- and, Mrs. Hernandez, I am mostly just interested in the -- the sources themselves without respect to the amounts right now. But the Social Security and your job. Correct?

A. Yes.

Q. Any other sources of income?

A. No.

Q. Okay. Your husband did not have any type of a retirement account. Is that correct?

A. No.

Q. And did he have any savings account?

92

A. No.

Q. Did either of your two sons provide for the financial support of you or your husband back in September of 2011?

A. No.

Q. Did you or your husband provide for the financial support of anyone in 2011?

A. No.

Q. You probably told me this already, but your two sons, Jose -- where does Jose live, and Angela?

A. Houston.

Q. Okay. So they're in the general area?

A. (Witness nods head affirmatively.)

Q. And Carlos, he's not married. Correct?

A. Correct.

Q. And where does he live?

A. Rosharon.

Q. Rosharon?

A. Yes.

Q. Where's that?

MR. SCHWARTZ: Brazoria County.

MR. REUSS: Okay. I'm getting a geography lesson here, Norm.

MR. SCHWARTZ: I don't know all the towns, but I know those.

READING COPY FOR SIGNATURE

**93**

MR. REUSS: You haven't missed one yet.

Q. (BY MR. REUSS) Okay. After Mr. Hernandez became ill with the symptoms we talked about that kind of progressed in probably late September and October of 2011, how often would you -- would your sons come to visit or to see him and you?

A. It varied.

Q. Some families get together every Sunday for dinner. Some families don't get together at all. Where are you in that mix?

A. No. The one here in Houston --

Q. Jose?

A. Jose would visit, probably in a year's time, maybe 10 times because it's --

Q. Okay.

A. He and his wife like to do a lot of stuff together, and they go places. Carlos, his varied because he worked six days on, three days off, and so he was lucky to get one weekend.

Q. Okay. He's at TDC. Right?

A. Yes.

Q. Okay.

A. So he came more often than Jose did, but --

Q. Okay. And Carlos has --

A. Jacob.

**94**

Q. Jacob, the grandson. Right?

A. Yes.

Q. How often did Jacob get a chance to see his grandfather, say, in September -- or in 2011 and 2012?

A. Uh, a lot.

Q. Okay. So he'd be there more -- more -- would Jose -- well, how would he come to see your father -- or your husband?

A. We would -- I would pick him up on Fridays and take him with us -- with us to the house, and then we'd -- on Carlos's weekends, we'd go over there. You know, just a back and forth thing.

MR. REUSS: Let's go off the record for just a second if we could.

THE VIDEOGRAPHER: We are going off the record. The time now is 11:49.

(Break.)

(Mr. Musslewhite left the deposition proceeding.)

THE VIDEOGRAPHER: The time is now 12:01. We are going back on the record.

Q. (BY MR. REUSS) Mrs. Hernandez, I have just a few more questions from you. I have looked through some of the records Mr. Schwartz has been kind enough to provide us here, and I notice a reference to

**95**

Reliable Insurance, $5,000.

Was that a life insurance payment made on -- in view of Mr. Hernandez's death?

A. Yes.

Q. Was there any other life insurance payments made, other than the Reliable Insurance payment for $5,000?

A. Yes, Standard.

Q. Okay. And I pulled the Standard Insurance Company document. How much did they pay?

A. I don't remember positively, but it was 20 or 25,000.

Q. Okay. This letter indicates that they had received a claim for life insurance benefits and were beginning to review it, but they ultimately paid about 20 or $25,000?

A. Yes.

Q. And did you make a lump sum death payment claim to Social Security?

A. Yes.

Q. And did they pay that?

A. Yes.

Q. And how much was that?

A. I think it was 225. I'm not positive, though, but it wasn't much.

**96**

Q. $225?

A. I think so.

MR. SCHWARTZ: It's a burial allowance, not much.

THE WITNESS: That doesn't pay for anything.

Q. (BY MR. REUSS) Was Mr. Hernandez eligible for Medicare benefits?

A. Yes.

Q. And was that because of his disability?

A. Yes.

MR. SCHWARTZ: We haven't started the lien process yet.

MR. REUSS: Right. Right. I understand. I understand.

Q. (BY MR. REUSS) Is Exhibit -- Plaintiffs' Exhibit 27, is that -- I saw a voluntary affidavit of relinquishment of parental rights. And I assume that that was signed by your husband. Correct?

A. Yes.

Q. And that was a document that was filed in the lawsuit relating to Allyson Sewell. Correct?

A. Yes.

Q. Exhibit 15 is the last will and testament of your husband. Correct?

97

A. Yes.

Q. And then we also have a document here, Exhibit 14, Plaintiffs' Exhibit 14, a revocable living trust agreement between you and your husband. Correct?

A. Yes.

Q. Okay. And then we also have here as part of Exhibit 10 something that's styled "Time Line of Illness." Can you tell me what that is?

A. Yes. They were putting together how things happened and when the doctors -- when he saw doctors and stuff like that.

Q. Okay. And when you say "they," you mean who?

A. Oh, my lawyers.

Q. Okay. And who prepared the timeline of illness? Was that you?

A. No.

Q. It was Joe?

A. No. He helped with it. Joe was talking to the lawyers and --

Q. Okay. Your understanding is that the lawyers prepared Exhibit 10 based upon what Joe told them?

A. Right.

Q. I'm looking here at Exhibit -- Plaintiffs' Exhibit 4, and it looks to me to be a -- well, it's styled Certification of Vital Records. You understand

98

this to be the death certificate?

A. Yes.

Q. And then it makes reference to under the cause -- oh, I'm sorry. It does say complications of obesity?

A. Yes.

Q. And then there was a reference in -- on the first page of the document at the top to pending toxicology?

A. Yes.

Q. And you probably understood that sometimes it takes several days for a toxicology to come through on a death?

A. Yes.

Q. Do you know whether they found anything abnormal in the toxicology?

A. Nothing.

Q. Nothing? Okay. Mrs. Hernandez, thank you very much for your time and your patience today. I know this was a trying episode for you, and I appreciate the opportunity to talk to you today.

A. Sure.

Q. I think that's all the questions we have at this point.

A. Okay.

99

MR. SCHWARTZ: Plaintiff reserves until time of trial all questions.

THE VIDEOGRAPHER: The time now is 12:06. We are off the record.

100

CHANGES AND SIGNATURE

PAGE/LINE     CHANGE          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

READING COPY FOR SIGNATURE

## 101

I, MARY ANN HERNANDEZ, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MARY ANN HERNANDEZ

THE STATE OF _____ )
COUNTY OF _____ )

Before me, _____, on this day personally appeared MARY ANN HERNANDEZ, known to me (or proved to me under oath or through _____ ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed. Given under my hand and seal of office this _____ day of _____, 2015.

_____
NOTARY PUBLIC IN AND
for the STATE OF _____

## 102

NO. 74064

JOSEPH HERNANDEZ AND : IN THE DISTRICT COURT OF
MARY HERNANDEZ :
:
vs. : BRAZORIA COUNTY, TEXAS
:
THE KROGER CO., KROGER TEXAS :
L.P, KROGER LIMITED :
PARTNERSHIP I, KROGER LIMITED:
PARTNERSHIP II, KROGER 509 :
OPERATOR, INC., KROGER 017 :
OPERATOR, INC., KROGER :
MANAGEMENT - NMTC DALLAS I, :
LLC, KROGER MANAGEMENT - NMTC:
HOUSTON I, LLC, KROGER :
DEDICATED LOGISTICS CO., THE :
KROGER CO. FOUNDATION, :
KROGER ASSOCIATES, INC., :
KROGER/327 L.P. : 149TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF MARY ANN HERNANDEZ
MAY 27, 2015

I, Cherlyn K. Mann, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARY ANN HERNANDEZ, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, 2015, to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2015;

That the amount of time used by each party at the

## 103

deposition is as follows:

Mr. James K. Reuss - 01:51

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Newton B. Schwartz, Sr., Attorney for Plaintiffs
Fax: (713) 630-0789

Mr. Benton Musslewhite, Attorney for Plaintiffs
Fax: (713) 680-1068, Room 101

Mr. James K. Reuss, Attorney for Defendants
Fax: (614) 365-9145

Mr. Brock Akers, Attorney for Defendants
Fax: (713) 583-8662

## 104

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 2nd day of June, 2015.

_____
Cherlyn K. Mann, Texas CSR 5461
Expiration Date: 12/31/16
HIPAA Certified
Expiration Date: 01/03/17
Firm Registration No. 47
Carol Davis Reporting Records
& Video
7838 Hillmont
Houston, Texas 77040
Phone: (713) 647-5100
Fax: (713) 647-5157

COPY FOR SIGNATURE
REDACTED COPY

105

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original signature page was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original signature page was delivered to Mr. James K. Reuss, Custodial Attorney;

That $_____ is the deposition officer's charges to the Defendants for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me this _____ day of _____, 2015.

_____
Cherlyn K. Mann, Texas CSR 5461
Expiration Date: 12/31/16
HIPAA Certified
Expiration Date: 01/03/17
Firm Registration No. 47
Carol Davis Reporting Records
& Video
7838 Hillmont
Houston, Texas 77040
Phone: (713) 647-5100
Fax: (713) 647-5157

READING COPY FOR SIGNATURE

READING COPY FOR SIGNATURE

CHANGES AND SIGNATURE

PAGE/LINE     CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

CHANGES   AND   SIGNATURE

PAGE/LINE     CHANGE                REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, MARY ANN HERNANDEZ, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____

MARY ANN HERNANDEZ

THE STATE OF _____ )

COUNTY OF _____ )

Before me; _____ , on this day personally appeared MARY ANN HERNANDEZ, known to me (or proved to me under oath or through _____ ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed. Given under my hand and seal of office this _____ day of _____ , 2015.

_____
NOTARY PUBLIC IN AND
for the STATE OF _____

Case # 2

**William E.Burns, M.D.**
**Family Practice**
**201 Oak Dr. South #101,**
**LAKE JACKSON, TX 77566**
**(979) 297-4507**
**FAX (979) 480-9074**

**12/12/2012**

To Whom It May Concern:

Mr. Joe Hernandez is my patient who recently had a positive test for Listeria. He was referred to a gastroenterologist, Dr. Sweatt for treatment. If I can be of any further assistance to you please feel free to contact my office staff.

Sincerely,

William E.Burns, M.D.

| | | |
|---|---|---|
| JOSEPH HERNANDEZ and MARY HERNANDEZ, Plaintiffs | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | BRAZORIA COUNTY, TEXAS |
| THE KROGER CO., ET AL. Defendants | §<br>§<br>§ | 149th JUDICIAL DISTRICT |

## AFFIDAVIT OF DR. WILLIAM BURNS

STATE OF TEXAS      §
COUNTY OF     §

"My name is Dr. William Burns, and I am over the age of 18 and capable of making this Affidavit. The statements made herein are of my own knowledge or gathered from information which I normally rely on and are true and correct.

I am a physician licensed to practice in and within the State of Texas. My license to practice medicine is presently on file with the requisite authorities and is in good standing.

I have reviewed medical records regarding Joseph Hernandez, from Family Practice, Brazosport Regional Health System, Quest Diagnostics Incorporated, Angleton Danbury Medical Center, Dr. William Sweatt, and Dr. Nizar Charafeddine. The medical records indicated that I have treated Joseph Hernandez from about July 12, 2012 to the date of his death, i.e. June 5, 2014. Mr. Hernandez came to see me because he wanted me to be his primary doctor.

Mr. Hernandez was diagnosed by me as having been infected with Listeria. The diagnosis is being confirmed after I sent Mr. Hernandez's sample to Quest Diagnostics Incorporated for testing on October 16, 2012.

Mr. Hernandez started with diarrhea, fever, urine infection after he consumed a cantaloupe in 2011. He was later treated by Dr. Nizar Charafeddine, and he was tested positive for Clostridium Difficile Toxin. On November 1, 2011, Dr. William Sweatt had diagnosed Mr. Hernandez with Clostridium Difficile Toxin.

It is my observation that Mr. Joseph Hernandez's subsequent illness, and my opinion based on reasonable medical probability that Mr. Joseph Hernandez sustained Listeria infection by consuming contaminated food.

I have read the foregoing Affidavit and it is true and correct and based upon my examination of

the patient, Mr. Joseph Hernandez, his treatment, testing and finding of Listeria.

Further, affiant sayeth not."

Dr. William Burns
Family Practice
201 Oak Drive South, No. 101
Lake Jackson, Texas 77566
Phone: (979) 297-4507
Fax: (979) 480-9074

SWORN TO AND SUBSCRIBED before me on this the _24_ day of _August_ ,2015.



NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My commission expires: _1/23/2016_

expires: _1/23/2016_

PEGGY L. CHRIST
MY COMMISSION EXPIRES
January 23, 2016

| From: | Robin Rios [robin.rios1@gmail.com] |
| --- | --- |
| Sent: | Wednesday, October 14, 2015 1:34 PM |
| To: | Newton B Schwartz |
| Subject: | Re: Hernandez v. Kroger estimate |

Pamela,

When I get the transcript done, I will email you a final invoice on it. After that is paid, I will file the transcript with the COA and also email you a copy.

Thanks so much.

Robin Rios
robin.rios1@gmail.com
979-864-1483

On Wed, Oct 14, 2015 at 11:30 AM, Newton B Schwartz <nbs@nbslawyers.com> wrote:

Ms. Rios,

Per Mr. Schwartz:

Upon completion of the September 1, 2015 hearing transcript requested and paid for, please file with the Clerk of the Court and forward any related charges.

Also, upon completion, please forward a copy of the transcript to our office via email transmittal.

Thank you.

Pamela D. Holman for

Newton B. Schwartz, Sr.

Law Office of Newton B. Schwartz, Sr.

1911 Southwest Freeway

1

HOUSTON, TEXAS 77098

(713) 630-0708 Tel

(800) 536-6006 toll

(713) 630-0789 Fax

nbs@nbslawyers.com

This electronic transmission (and/or the documents attached to it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521, and may be legally privileged. This message (and any associated files) are intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify The Law Office of Newton B. Schwartz, Sr. immediately by telephone (713 630-0708) and destroy the **original** message.

**From:** Robin Rios [mailto:robin.rios1@gmail.com]
**Sent:** Tuesday, October 13, 2015 9:35 AM
**To:** nbs@nbslawyers.com
**Subject:** Hernandez v. Kroger estimate

I'm sorry for the delay. I let this slip through the cracks. Please let me know if you need anything else. Thanks so much for calling to follow-up.

Robin Rios

robin.rios1@gmail.com

979-864-1483

1. Violation of the public policy of Texas prohibiting the sale of unsafe, adulterated, and/or misbranded food for human consumption, since 194 by Texas Supreme court cases, *Jacob Decker & Sons, Inc. v. Capps*, 139 Tex. 609; 164 S.W.2d 828 1942 Tex. LEXIS 275; 142 A.L.R. 1479 (1942) and *Griggs Canning Co. v. Josey,* 139 Tex, 623, 164 S.W. 2d 825, 840 (Tex. 1942).

2. DTPA per § 17.50(a)(2) and

3. Personal Injury and (b) Wrongful death doctrine—CPRC § 71.001, et seq; and
   (c) Survival Act per CPRC §71.021, et seq; and

4. Negligence and Negligence Per Se for statutory violations of Federal "Food, Drug and Cosmetic Act" per 21 U.S.C. § 301-357 and §341-350 (1-1), Annual Report for Congress; and (b) requiring actual in-store notices of Listeria, including failure to warn of Listeria and (c) failed to post country of origin where grown or imported from, outside the United States for 21 U.S.C. §350(f)(g) and (h) of Listeria and sale of adulterated or misbranded foods unsafe for human consumption.

5. Failed to grant Appellants' timely Motions to conduct additional discovery after Kroger defendants' failing to timely answer and denying Appellants' Requests for Production of documents per TRCP 196 for months without good cause, delaying Appellants' review of and discovery from grower of melons and failing to disclose Jenson Farms and/or Frontera Produce, Ltd., as growers and suppliers to Kroger and/or of known Listeria in melons as of date of sale September 3, 2011.

Per Reporters' Record and Clerk's Record:

Appellant timely responded, controverted and objected to Kroger Defendants' Traditional and No-Evidence Motions for Summary Judgment. See Transcript of Reporter's Record of September 1, 2015 hearing, requested, paid for and acknowledged by Court Reporter Robin Rios on October 13, 2015 (attached) and by Exhibits: Exhibit AA—purchase of known Listeria laden Melons from Kroger defendants—September 3, 2011

Exhibit BB—Mary Hernandez's deposition testimony regarding—its purchase, original refrigeration and eaten and ingested solely by Joseph Hernandez, deceased. Exhibit CC— Treating doctor's diagnosis of Listeria in Melon, causally related to his sickness, injuries, and illness by Dr. William Burns, M.D. and his controverting Affidavit (Exhibit DD) filed timely, one week prior to September 1, 2015 hearing. Exhibit EE—See Texas above declared Texas

public policy since 1942 to date surviving  enactment of (1) Chapter CPRC § 82.003-82.008—Strict Product Liability governing such food for consumption such per *Jacob Decker & Sons, Inc. v. Capps*, 139 Tex. 609; 164 S.W.2d 828 1942 Tex. LEXIS 275; 142 A.L.R. 1479 (1942) and *Griggs Canning Co. v. Josey,* 139 Tex, 623, 164 S.W. 2d 825, 840 (Tex. 1942), declared the Public Policy of Texas to date present that the seller of food (Kroger) for public consumption as here is strictly liable without fault or negligence and/or this Public Policy is not affected by later enactment of CPRC Chapter 82 for illnesses and injuries and death resulting, including that a melon or cantelope is not a designed or manufactured product within CPRC Chapter 82.